Filed 8/19/20  P. v. Burkhart CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>HARRY BURKHART,<br><br>      Defendant and Appellant. | B289069, B292354<br><br>(Los Angeles County<br>Super. Ct. No. BA425399) |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Conditionally reversed and remanded with instructions.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Assistant Attorney General, Jason Tran and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Defendant Harry Burkhart appeals from a judgment of conviction entered after a jury trial for 18 counts of arson of an inhabited structure, 25 counts of arson of property, two counts of arson of a structure, two counts of attempted arson, and two counts of possession of flammable material.  After a bifurcated trial on Burkhart's sanity, the jury found Burkhart was sane when he set the fires.

Burkhart contends his trial counsel in his opening statement and closing argument conceded Burkhart's guilt as to several of the charged offenses in violation of his Sixth Amendment right to counsel under *McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500] (*McCoy*).  He also argues remand is necessary to determine his eligibility for mental health diversion pursuant to Penal Code section 1001.36.[1]  Burkhart further asserts the trial court violated his right to due process by imposing certain fines and assessments absent evidence of his ability to pay.  Burkhart, who was 24 years old when he committed the offenses, also seeks remand for an opportunity to make a record of information relevant to his future youth offender parole hearing under section 3051.

We reject Burkhart's argument his trial counsel's conduct violated his constitutional right to counsel, but we conditionally reverse for the trial court to conduct a hearing on Burkhart's eligibility for mental health diversion.  If the trial court does not grant diversion, or if Burkhart is unsuccessful in completing diversion, the court shall reinstate his convictions and sentence. In that case, the trial court should allow Burkhart to request a

---

[1]     All further undesignated statutory references are to the Penal Code.

hearing and present evidence demonstrating his inability to pay the court assessments and fines imposed by the court. The trial court shall also allow Burkhart an opportunity to make a record of information relevant to his future youth offender parole hearing under section 3051.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Indictment*

The grand jury returned a 49-count felony indictment against Burkhart, charging him with 18 counts of arson of an inhabited structure (§ 451, subd. (b); counts 1, 2, 4, 5, 8, 12, 14, 15, 19, 22, 29, 33, 37, 38, 40, 42, 44, & 46); 25 counts of arson of property (§ 451, subd. (d); counts 3, 6, 7, 9, 10, 11, 13, 16, 17, 20, 21, 23, 24, 25, 27, 28, 30, 32, 34, 35, 36, 39, 43, 45, & 47); two counts of arson of a structure (§ 451, subd. (c); counts 31 & 41); two counts of attempted arson (§ 455; counts 18 & 26); and two counts of possession of flammable material (§ 453, subd. (a); counts 48 & 49). The indictment further alleged as to each count for arson of a structure or an inhabited structure the arsons were caused by use of a device designed to accelerate the fire or delay ignition (§ 451.1, subd. (a)(5)).

Burkhart pleaded not guilty and not guilty by reason of insanity and denied the special allegations.

B. *The Guilt Phase of Trial*

1. *The evidence*

From the early morning of December 30, 2011 until his arrest in the early morning of January 2, 2012, Burkhart lit a series of more than 40 fires. Burkhart started each fire by

3

placing a fire starter atop an artificial fire log,[2] which he positioned beneath the engine compartment of an automobile, usually one parked in a carport. Many of the fires spread to surrounding structures, including some residences. Burkhart typically lit clusters of fires by setting logs aflame beneath multiple parked cars in a particular location, then traveling to another area to do the same.

Video surveillance cameras recorded Burkhart purchasing numerous fire starters at several locations of a grocery store chain on December 28, 29, 30, and 31. For each purchase, Burkhart used a rewards card at the register. Additional video footage placed Burkhart or his vehicle in close proximity to the location of several of the fires around the time they were lit. Burkhart was identified in the videos in part because he always wore a pony tail and all-black clothing, and he walked with a distinctive limping gait. DNA evidence recovered from a propane cannister and a matchbox connected Burkhart to two of the crime scenes.

When Burkhart was arrested in the early morning of January 2, officers found fire-starting materials between the front seats of his vehicle. No similar fires occurred after Burkhart's arrest.

Burkhart did not testify or call any witnesses during the guilt phase of his trial.

---

[2] Fire starters are wax-based packages containing petroleum-based fuel, designed quickly to ignite a fire. Artificial fire logs are compressed wooden logs infused with wax.

### 2. *The guilt phase verdict*

The jury found Burkhart guilty of all counts and found true the special allegations the arsons were caused by use of a device designed to accelerate the fire.

### C. *The Sanity Phase of Trial*

Forensic psychologist Dr. Richard Romanoff testified for the defense and opined Burkhart suffered from autism spectrum disorder, impaired cognitive function, paranoid delusions, and stress-related psychotic mental illness, which rendered Burkhart legally insane when he set the fires. Forensic psychologist Dr. Kris Mohandie testified for the People. Dr. Mohandie also diagnosed Burkhart with autism spectrum disorder, but he opined Burkhart was not legally insane when he committed the charged offenses. Burkhart's first sanity trial ended in a mistrial because the jurors were unable to reach a unanimous decision.

Dr. Romanoff testified for the defense at Burkhart's second sanity trial and again opined Burkhart was legally insane when he set the fires. Forensic psychologist Dr. Joel Leifer testified for the People. Dr. Leifer opined Burkhart did not suffer from autism spectrum disorder or any other mental illness when he set the fires. The jury found Burkhart was sane at the time he committed all the offenses.

### D. *Sentencing*

The trial court sentenced Burkhart to an aggregate state prison term of 33 years four months. The trial court selected count 1 for arson of an inhabited structure as the base term and imposed the middle term of five years, plus the middle term of four years on the enhancement for use of a device designed to

5

accelerate the fire (§ 451.1, subd. (a)(5)).  On seven of the other counts for arson of an inhabited structure (counts 4, 5, 8, 12, 14, 15, and 33), the court imposed consecutive sentences of one year eight months (one-third the middle term of five years), plus one year four months (one-third the middle term of the four-year enhancement).  On count 31 for arson of a structure, the court imposed a consecutive term of one year four months, plus one year four months on the enhancement (one-third the middle term of four years for the base term and enhancement).  On count 34 for arson of property, the court imposed a consecutive term of eight months (one-third the middle term of two years).

The court imposed the middle term of two years on the remaining counts for arson of property (counts 3, 6, 7, 9, 10, 11, 13, 16, 17, 20, 21, 23, 24, 25, 27, 28, 30, 32, 35, 36, 39, 43, 45, & 47), attempted arson (counts 18 & 26), and possession of flammable material (counts 48 & 49), to run concurrently.  As to the remaining counts for arson of a structure and arson of an inhabited structure (counts 2, 19, 22, 29, 37, 38, 40-42, 44, & 46), the court imposed the middle term of five years on each count, to run concurrently, and struck the enhancements in the interest of justice.

The trial court imposed a $1,470 court facilities assessment ($30 per count) (Gov. Code, § 70373, subd. (a)(1)) and a $1,960 court operations assessment ($40 per count) (Pen. Code, § 1465.8, subd. (a)(1)).  The court imposed a restitution fine of $5,000 (Pen. Code, § 1202.4, subd. (b)), and it imposed and suspended a parole revocation restitution fine in the same amount (Pen. Code, § 1202.45).  Burkhart did not object to imposition of the assessments and fines or raise his inability to pay.  The court

continued the hearing on victim restitution. Burkhart timely appealed (No. B289069).

At the continued hearing, the parties stipulated to imposition of $30,000 in victim restitution. The trial court imposed $29,143.07 in victim restitution. Burkhart timely appealed the restitution award (No. B292354), and we consolidated the appeals.[3]

## DISCUSSION

A. *Burkhart's Trial Counsel Did Not Concede His Guilt in Violation of His Sixth Amendment Right to Counsel*

1. *Proceedings below*

Steven Schoenfield represented Burkhart at trial. Before and during trial, Burkhart maintained he was innocent of all charges, contending his mental illness prevented him from leaving the house. Burkhart wanted to call his neighbors as alibi witnesses he believed would testify Burkhart was at his home at the time the fires were set; to present evidence "about the true criminals in this case"; and to argue "those people in the videos were actors." On several occasions both before and during trial, Burkhart requested to replace Schoenfield as his court-appointed attorney pursuant to *People v. Marsden* (1970) 2 Cal.3d 118

---

[3] Although Burkhart appealed from the trial court's imposition of victim restitution, he failed to address victim restitution in his opening brief, thereby forfeiting any challenge on appeal. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 ["the claim is omitted from the opening brief and thus waived"]; *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief are deemed waived or abandoned."].)

because Schoenfield would not follow Burkhart's preferred approach and Burkhart did not trust him.

During his opening statement, Schoenfield stated, "There is no question that [the prosecutor] has evidence to tie Mr. Burkhart to six or seven of . . . these charged fires. And it's a virtual certainty that there will be a sanity phase in this trial. I have no illusions about that. [¶] For the other 40 or so fires, you'll be asked to convict because of the similar method of operation and the location and the timing of the incidents. [¶] So as you take in the evidence I ask you to hold [the prosecutor] to the burden of proof as to all the charges." Schoenfield explained some of his questions would be relevant to the sanity phase of trial. Schoenfield concluded, "Once again, I ask you to pay close attention to all the evidence. Most importantly, I ask you all to keep an open mind."

During his closing argument, Schoenfield stated, "[C]learly, [the prosecutor] has presented evidence connecting Harry Burkhart directly to some of the charged fires. [¶] The DNA evidence taken from the matchbox and the propane canister connect [Burkhart] to two of the incidents. . . . [¶] And the video evidence reasonably makes a case against Harry Burkhart [as to four other fires]." Schoenfield acknowledged this evidence connected Burkhart with six or seven of the charged fires. But he added, "[A]s for those . . . six cases, that is what reasonable doubt looks like. The remainder of the fires, they want you to convict because of the method of operation and because the fires were done in the same time period and in the Los Angeles area. [¶] The problem is they haven't proven each of those fires beyond a reasonable doubt. [T]hey have proven 40 or so of these other arsons by use of starter materials. However, the prosecution still

must have actual evidence to link Harry Burkhart to each of those individual fires, and that standard is beyond a reasonable doubt." Schoenfield noted "copycats could be responsible" and argued "[t]he prosecution lacks specific evidence against Harry Burkhart for the bulk of the charged arsons."

Schoenfield continued, "We know that the burden of proof is on the government, but let's try and understand the definition and truly feel the weight of the proof required to convict. [¶] . . . [¶] It's the highest standard of proof of any court in the world." Schoenfield closed, "[The prosecution has] evidence for six of [the fires], but they don't have the evidence for the rest of them. [¶] And I ask you to look at the evidence very carefully, and to convict [Burkhart] of the crimes that they have proven and not of the ones that they do not have the evidence."

2. *Burkhart's trial counsel did not concede his guilt under* McCoy

Burkhart contends his trial counsel conceded Burkhart's guilt as to six or seven of the arson counts during his opening statement and closing argument in violation of Burkhart's Sixth Amendment right to counsel recognized in *McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. 1500]. In *McCoy*, the United States Supreme Court held "counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." (*Id.* at p. ___ [138 S.Ct. at p. 1510].) The court explained the Sixth Amendment, which "guarantees to each criminal defendant 'the Assistance of Counsel for his defence,'" gives the defendant "[a]utonomy to decide that the objective of the defense is to assert innocence" and to "insist on maintaining [his or] her innocence at the guilt phase of a capital trial." (*Id.* at

9

pp. ___ [138 S.Ct. at pp. 1507-1508].) "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id.* at p. ___ [138 S.Ct. at p. 1509].)

In contrast to determination of the objective of the defense, reserved to the defendant, "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" (*McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. at p. 1508]; accord, *People v. Frederickson* (2020) 8 Cal.5th 963, 993 ["Defense counsel can make strategic choices regarding how best to achieve a defendant's objectives, but the defendant chooses those objectives."].)

Burkhart contends Schoenfield's opening statement and closing argument conceded Burkhart's guilt to six or seven of the charged arson counts, over his intransigent objection to any admission of guilt. The People assert Schoenfield's statements do not amount to a concession of guilt under *McCoy*, but rather, a strategic decision to emphasize the prosecution's lack of direct evidence as to the majority of counts, while still holding the prosecution to its burden of proof as to all of the counts. The People have the better argument.

The facts here are distinguishable from those in *McCoy*. There, the defendant faced the death penalty for three murders. (*McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. at pp. 1505-1506].) During defense counsel's opening statement in the guilt phase of the trial, the attorney "told the jury there was 'no way reasonably possible' that they could hear the prosecution's evidence and

10

reach 'any other conclusion than Robert McCoy was the cause of these individuals' death,'" and "the evidence is 'unambiguous,' 'my client committed three murders.'" (*Id.* at p. ___ [138 S.Ct. at pp. 1506-1507].)  Although the defendant took the stand and testified he was innocent, defense counsel in his closing argument in the guilt phase "reiterated that [the defendant] was the killer" and "told the jury that he 'took [the] burden off of [the prosecutor].'" (*Id.* at p. ___ [138 S.Ct. at p. 1507].)  As the *McCoy* court explained, defense counsel's "express motivation for conceding guilt was . . . to try to build credibility with the jury, and thus obtain a sentence lesser than death." (*Id.* at p. ___ [138 S.Ct. at p. 1510].)  The United States Supreme Court reversed the judgment of conviction, holding the trial court's allowance of defense counsel's admission of the defendant's guilt had violated the defendant's Sixth Amendment right to counsel.  (*Id.* at p. ___ [138 S.Ct. at p. 1512].)

Here, unlike in *McCoy*, Schoenfield did not tell the jury Burkhart was guilty of any of the charged offenses.  Although Schoenfield in his opening statement noted the People presented evidence (including DNA evidence from a matchbox and propane canister, and video footage placing Burkhart near the location of several of the fires) that "connect[ed]" Burkhart to six or seven of the fires, Schoenfield added as to those fires, "[T]hat is what reasonable doubt looks like."  As to the video evidence that showed Burkhart near the scene of the fires, Schoenfield acknowledged the evidence "reasonably makes a case" against Burkhart.  But Schoenfield also urged the jury to "hold [the prosecutor] to the burden of proof as to all the charges."  And during his closing argument, Schoenfield reiterated "the burden of proof is on the government" and requested the jury "to look at

11

the evidence very carefully, and to convict [Burkhart] of the crimes that they have proven and not of the ones that they do not have the evidence." Schoenfield distinguished between the six or seven arson counts for which the People introduced direct evidence of Burkhart's involvement from the "40 or so" counts for which the People relied on the similarity in modus operandi, but at no time did Schoenfield state Burkhart was guilty of arson or set the fires, or purport to relieve the prosecution of its burden of proof. (Cf. *McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. at p. 1507]; *People v. Flores* (2019) 34 Cal.App.5th 270, 272 [defense counsel's admission defendant facing attempted murder charge was driving the car that seriously injured police officer (instead arguing defendant did not have intent to kill), over defendant's repeated objection he was not the driver, violated defendant's Sixth Amendment right to counsel]; *People v. Eddy* (2019) 33 Cal.App.5th 472, 477 [defense counsel's concession defendant committed manslaughter (but not first degree murder) despite defendant's insistence he was factually innocent violated defendant's Sixth Amendment right to counsel].)[4]

Rather, Burkhart's disagreement with Schoenfield was over trial strategy, not the trial objective. Schoenfield focused on the absence of direct evidence linking Burkhart to the majority of the fires, while maintaining the People bore the burden to prove guilt

---

[4] The People also rely on *People v. Lopez* (2019) 31 Cal.App.5th 55, 62, in which the Court of Appeal considered defense counsel's statements "'[a]s to the hit and run, he's guilty of it'" and "'he should be punished for it.'" However, the Court of Appeal in *Lopez* affirmed the defendant's conviction because the record did not reflect he had objected to his attorney's decision to concede guilt on the hit and run charge. (*Id*. at p. 66.)

beyond a reasonable doubt as to all counts.  Schoenfield believed this approach would preserve his credibility with the jury at both the guilt and sanity phases of Burkhart's trial.  But Burkhart wanted Schoenfield to argue the person shown in the videos was not him, but an actor; his mental illness prevented him from leaving the house; and other witnesses saw him at home during the fires.  Despite Schoenfield and Burkhart's disparate views on the appropriate theory of the case, the disagreement was over "'what arguments to pursue,'" not Burkhart's constitutional right to determine the objective of his defense was innocence.  (*McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. at p. 1508]; *People v. Frederickson, supra*, 8 Cal.5th at p. 1001.)

B.    *Burkhart Is Entitled to an Eligibility Hearing for Mental Health Diversion*

Effective June 27, 2018, "the Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 1810 (2017-2018 Reg. Sess.) . . . .  [Citation.]  Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (§ 1001.36, subd. (a).)"  (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).)  "The stated purpose of the diversion statute 'is to promote all of the following:  [¶]  (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.  [¶]  (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.  [¶]  (c) Providing diversion that meets the unique mental health treatment and support needs of

13

individuals with mental disorders.' (§ 1001.35, subds. (a)-(c).)" (*Frahs*, at p. 626.)

Under section 1001.36, subdivision (c), "'pretrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication . . . ." If a defendant is charged with qualifying offenses,[5] "a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (*Frahs, supra*, 9 Cal.5th at pp. 636-627; accord, *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1115, fn. 13; see § 1001.36, subd. (b)(1)(A)-(F).)

If the six criteria in section 1001.36, subdivision (b)(1), are met, and if the trial court "is satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant" (*id.*, subd. (c)(1)(A)), then the trial court may order pretrial diversion into an approved mental health treatment program for up to two years (*id.*, subd. (c)(1) & (3)). If the defendant commits an additional offense or otherwise performs

---

[5] A defendant may not be placed into a diversion program for the charged offenses of murder, manslaughter, use of a weapon of mass destruction, or certain enumerated sex offenses. (§ 1001.36, subd. (b)(2).)

14

unsatisfactorily in the diversion program, the trial court may reinstate the criminal proceedings. (*Id.*, subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id.*, subd. (e).) Upon successful completion of diversion, "the arrest upon which the diversion was based shall be deemed never to have occurred . . . ." (*Ibid.*; accord, *Frahs, supra*, 9 Cal.5th at p. 627.)

Burkhart contends, the People concede, and we agree section 1001.36 applies retroactively to Burkhart's prosecution. (*Frahs, supra*, 9 Cal.5th at pp. 624-625.) As the *Frahs* court observed, section 1001.36 "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.) Thus, section 1001.36 is presumptively retroactive. (*Frahs*, at p. 631.) As in *Frahs*, in light of the significant evidence presented at trial of Burkhart's mental illness, we conditionally reverse Burkhart's judgment of conviction and direct the trial court to determine whether Burkhart qualifies for diversion under section 1001.36. (See *Frahs, supra*, 9 Cal.5th at p. 640 ["we conclude that a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when, as here, the record affirmatively discloses that the defendant appears to . . . suffer[] from a qualifying mental disorder"]; *People v. Burns* (2019) 38 Cal.App.5th 776, 788.) If the trial court exercises its discretion to grant diversion and Burkhart completes diversion, the trial court shall dismiss the charges. (*Frahs*, at p. 641.) If the court determines Burkhart is ineligible for diversion or exercises its discretion not to grant diversion, or

if Burkhart is not successful in completing diversion, Burkhart's convictions and sentence shall be reinstated.  (*Ibid.*)

C.    *Burkhart Is Entitled to a Hearing on His Ability To Pay the Assessments and Fines*

Burkhart requests we remand the case for the trial court to conduct an ability-to-pay hearing in accordance with our opinion in *Dueñas* because he was indigent at the time of sentencing.  We agree if the judgment is reinstated, Burkhart should have an opportunity on remand to request a hearing and present evidence demonstrating his inability to pay the assessments and restitution fines imposed by the trial court.

1.    Dueñas *and its progeny*

In *Dueñas* this court concluded "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168; accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655 (*Belloso*), review granted Mar. 11, 2020, S259755.)[6]  In

---

[6]    Several Courts of Appeal have applied this court's analysis in *Dueñas* (e.g., *People v. Santos* (2019) 38 Cal.App.5th 923, 929-934; *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96, review granted Nov. 13, 2019, S257844 [applying due process analysis to court assessments]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1035).  Others have rejected the due process analysis (e.g.,

16

contrast to court assessments, a restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime." (*Dueñas*, at p. 1169; accord, *Belloso*, at p. 655.)[7]  Section 1202.4, subdivision (c), expressly provides a defendant's inability to pay a restitution fine may not be considered a "compelling and extraordinary reason" not to impose the statutory minimum fine.  However, as this court held in *Dueñas*, to avoid the serious constitutional questions raised by imposition of such a fine on an indigent defendant, "although the trial court is required by . . . section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, at p. 1172; accord, *Belloso*, at p. 655.)

---

*People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946), or concluded the imposition of fines and fees should be analyzed under the excessive fines clause of the Eighth Amendment (e.g., *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061; *Kopp*, at pp. 96-97 [applying excessive fines analysis to restitution fines]).  The Supreme Court granted review of the decision in *Kopp* to decide the following issues:  "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  If so, which party bears the burden of proof regarding defendant's inability to pay?"

[7]      Our analysis of restitution fines under section 1202.4, subdivision (b), also applies to parole revocation fines under section 1202.45, because these fines must be imposed "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (§ 1202.45, subd. (a).)

2. *On remand Burkhart is entitled to an opportunity to challenge imposition of the assessments and fines*

The People principally contend *Dueñas* was wrongly decided. We follow this court's due process analysis in *Dueñas*.[8]

---

[8] The People do not argue Burkhart forfeited his right to a hearing by failing to object to the assessments and fines at the time of their imposition, and we decline to find Burkhart forfeited his constitutional challenge as to the assessments. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 489 ["When, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture."]; see *Belloso, supra*, 42 Cal.App.5th at p. 662; *People v. Santos, supra*, 38 Cal.App.5th at pp. 931-932; *People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138.) As to the restitution fines, Burkhart had a right under section 1202.4, subdivision (d), to challenge imposition of a restitution fine above the $300 statutory minimum, and the parole revocation restitution fine in the same amount (§ 1202.45, subd. (a)). Although Burkhart failed in the trial court to challenge imposition of the $5,000 restitution fine and parole revocation restitution fine, "neither forfeiture nor application of the forfeiture rule is automatic." (*People v. McCullough* (2013) 56 Cal.4th 589, 593 [finding defendant forfeited challenge to imposition of booking fee where he failed to raise his ability to pay the fee in the trial court]; accord, *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["application of the forfeiture rule is not automatic," although "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"].) Because we are directing the trial court to hold an ability-to-pay hearing on remand as to the assessments, we leave it to the trial court's discretion whether to consider Burkhart's ability to pay the $5,000 restitution and parole revocation restitution fines on remand.

The People contend the record does not support a remand for an ability-to-pay hearing because Burkhart failed to show in the trial court he did not have the financial ability to pay the assessments and fines and failed to show he lacked the future earning capacity to pay, including from wages he would earn while in prison. However, because Burkhart was not aware of his ability to challenge the assessments and fines on due process and equal protection grounds, he should have that opportunity on remand. Moreover, at the time of sentencing Burkhart was 30 years old and terminally ill with cancer. The trial court noted Burkhart's "extremely serious health condition" as a mitigating factor at sentencing. Further, there was evidence Burkhart suffered from mental illness, and he had no history of employment.

The People's reliance on *People v. Johnson* (2019) 35 Cal.App.5th 134 is misplaced. There, the Court of Appeal declined to remand under *Dueñas*, finding any error in the trial court's imposition of fines and assessments without first determining the defendant's ability to pay was harmless because evidence in the record of the defendant's past earning capacity and ability to earn prison wages over his term of incarceration demonstrated an ability to pay the $300 restitution fine, $40 court operations assessment, and $30 court facilities assessment imposed by the trial court. (*Id*. at pp. 137-139.) The *Johnson* court reasoned, "The idea that [the defendant] cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable." (*Id*. at p. 139.) Although Burkhart's term of incarceration is lengthy, his significant mental and physical health problems diminish the likelihood he will be able to pay the much larger sum of $8,430 while serving his sentence.

19

We reject the People's additional contention Burkhart has not shown a due process violation because he has not demonstrated adverse consequences from imposition of the assessments and fines. As we explained in *Castellano*, "the defendant need not present evidence of potential adverse consequences beyond the fee or assessment itself, as the imposition of a fine on a defendant unable to pay it is sufficient detriment to trigger due process protections." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) The People are correct Burkhart must in the first instance request an ability-to-pay hearing and present evidence of his inability to pay the assessments and restitution fines. (*Ibid*.) We remand for him to do so.

D.    *Burkhart Is Entitled to a* Franklin *Hearing on Remand*

In a series of decisions, the United States and California Supreme Courts have curtailed imposition of sentences of life without parole (LWOP) on juvenile offenders, recognizing the lessened culpability and greater prospects for reform that distinguish juvenile from adult offenders. In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the United States Supreme Court held the imposition of an LWOP sentence on a juvenile offender who committed a nonhomicide offense violated the Eighth Amendment's prohibition on cruel and unusual punishment. (*Graham*, at pp. 68, 74.) In *Miller v. Alabama* (2012) 567 U.S. 460, 477 (*Miller*), the high court extended *Graham*, holding the imposition of a mandatory LWOP sentence on a juvenile in a homicide case also violated the Eighth Amendment. Relying on *Graham* and *Miller*, in *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) the California Supreme Court held the Eighth

20

Amendment bars "sentencing a juvenile offender to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy."

The Legislature enacted sections 3051 and 4801 "to bring juvenile sentencing in conformity with *Miller, Graham*, and *Caballero*." (*People v. Franklin* (2016) 63 Cal.4th 261, 268 (*Franklin*); accord, *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 298.) As originally enacted, section 3051 authorized a hearing by the Board of Parole Hearings (Board) "for the purpose of reviewing the parole suitability of any prisoner who was under 18 years of age at the time of his or her controlling offense." (Former § 3051, subd. (a)(1).) Section 3051 requires the Board to provide "a meaningful opportunity to obtain release" by conducting the youth offender parole hearing during the 15th, 20th, or 25th year of a juvenile offender's incarceration, depending on the offender's sentence. (§ 3051, subds. (a)(2)(B), (b)(1)-(3), & (e); accord, *Franklin, supra*, 63 Cal.4th at p. 277.) Section 4801, subdivision (c), provides the Board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law," when reviewing an offender's parole eligibility pursuant to section 3051.

In *Franklin*, the Supreme Court interpreted sections 3051 and 4801 to require a youth offender have a "sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin, supra*, 63 Cal.4th at p. 284; accord, *In re Cook* (2019) 7 Cal.5th 439, 451 ["an offender entitled to a hearing under sections 3051 and 4801 may seek the remedy of a *Franklin* proceeding even though the

21

offender's sentence is otherwise final"].)  The goal of the *Franklin* proceeding "is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law' [citation]." (*Franklin*, at p. 284.)  The *Franklin* court remanded for the trial court to determine whether the defendant had a sufficient opportunity to create a record, and if not, to "receive submissions and, if appropriate, testimony." (*Ibid.*)

Effective January 1, 2018, the Legislature amended section 3051 to authorize a youth offender parole hearing for all offenders who were 25 years old or younger at the time of the offense.  (§ 3051, subd. (a)(1).)  Burkhart argues he is entitled to remand for a *Franklin* proceeding because he was 24 years old when he committed the arsons.  The People do not dispute Burkhart is "eligible for release on parole at a youth offender parole hearing during [his] 15th year of incarceration." (§ 3051, subd. (b)(1).)  Instead, the People argue Burkhart forfeited his opportunity to create a record of relevant information because his attorney failed to present evidence at the time of sentencing (on March 23, 2018) or request a hearing in the trial court.  However, the goals of judicial forfeiture—proper development of the record for appellate review and judicial economy—are not advanced by applying forfeiture here.  (*People v. McCullough* (2013) 56 Cal.4th 589, 593; *In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  Because we are remanding for the trial court to conduct hearings on Burkhart's eligibility for mental health diversion and his ability

22

to pay the assessments and restitution fines, we instruct the trial court to provide Burkhart a sufficient opportunity, either upon our initial remand, or a subsequent reinstatement of the convictions and sentence, to make a record of information relevant to a later youth offender parole hearing.[9] (See *Franklin, supra*, 63 Cal.4th at p. 284.)

## DISPOSITION

We conditionally reverse the judgment and remand for the trial court to conduct a hearing on Burkhart's eligibility for mental health diversion. If the court determines Burkhart qualifies for diversion under section 1001.36, then the court may grant diversion. If Burkhart successfully completes diversion, then the trial court shall dismiss the charges.

If the trial court concludes Burkhart is ineligible for diversion or exercises its discretion not to grant diversion, or Burkhart does not successfully complete diversion, then the court shall reinstate Burkhart's convictions and sentence and allow Burkhart to request a hearing and present evidence demonstrating his inability to pay the assessments and fines. If Burkhart demonstrates his inability to pay the assessments, the trial court must vacate them. If the court determines Burkhart does not have the ability to pay the restitution fines, it must stay their execution. Further, the trial court shall provide Burkhart

---

[9] Because we remand for the trial court to conduct a *Franklin* proceeding, we do not reach Burkhart's contention Schoenfield provided ineffective assistance of counsel by failing to request a *Franklin* proceeding at the time of his sentencing.

23

an adequate opportunity to make a record of information relevant to a future youth offender parole hearing under section 3051.


                                        FEUER, J.

We concur:



        PERLUSS, P. J.



        DILLON, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.