Filed 10/16/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

DAGOBERTO SHOREQUE VILLA,

    Defendant and Appellant.

E074417

(Super.Ct.No. RIF1900014)

OPINION

APPEAL from the Superior Court of Riverside County. Bambi J. Moyer, Judge. Affirmed.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

While driving with his girlfriend, Jane Doe, and their infant child, Dagoberto Shoreque Villa, who was heavily intoxicated, began punching Doe and pulling out her hair in a fit of jealousy. When a police officer pulled them over after seeing him run a red light, he found Doe injured and bleeding and asked Villa to exit the vehicle. Villa identified himself using a false driver's license and resisted taking a blood alcohol test. Later, Doe accused Villa of having previously beat her with a belt buckle and threatening to have her deported if she disclosed the abuse. Villa denied these last charges but said he didn't remember the events on the night of the drunken driving.

A jury convicted Villa of inflicting corporal injury, child endangerment, driving under the influence of alcohol, driving with a blood alcohol content of .08 percent or more, falsely identifying himself to a police officer, giving false information to a police officer, and intimidating a victim.

On appeal, he argues the trial judge abused her discretion by excluding evidence Doe had applied for a visa available only to victims of domestic violence who cooperate in prosecuting their abusers. Though the evidence was relevant, we conclude the trial judge didn't abuse her discretion by excluding it. Doe gave a statement to police and testified against Villa at the preliminary hearing, when she didn't know about the visa program, and her trial testimony was the same except for some unimportant details. That fact makes the probative value of the evidence minimal, easily outweighed by the potential for wasted time and jury confusion. Moreover, the physical evidence of the abuse was overwhelming, so any error was harmless.

Villa also argues his defense counsel violated his right to self-determination when she conceded some of the charged offenses during closing argument. Assuming for the sake of argument that counsel did concede certain counts, there's no evidence Villa disagreed with her strategy, and his trial testimony suggests he supported the decision.

We therefore affirm the judgment.

# I

## FACTS

A. *The Offenses*

At the time of these events, Villa was around 28 years old, and Doe was 18 years old. They had recently had a child together and had lived together briefly.

On the evening of December 30, 2018, they went to a party held by Doe's aunt. Doe and Villa were outside by a fire, and the baby was sleeping inside. Doe left Villa a couple times to check on the baby. Around 11:00 or 11:30 p.m., after Doe returned from checking on the baby the second time, Villa abruptly indicated he wanted to leave. Doe said she got back, and he stood up and said, "I will wait for you in the car." Doe retrieved the baby and put him in a car seat in the back of his truck, and they left for their home in Perris.

According to Doe, Villa drank a lot of tequila at the party and was driving erratically. Doe complained about his driving, and Villa began yelling at her. He accused her of flirting with her cousins when she was checking on the baby. He then began hitting Doe and pulling her hair hard enough to take clumps out of her scalp. According Doe, he

3

hit her too many times to count.

Although they were on the freeway, Villa ordered Doe to get out of his truck. As Villa slowed the truck, Doe got the baby from the back. However, instead of stopping to let them out, Villa continued driving and grabbed the baby. When the baby started crying, he placed the baby on the center console between himself and Doe. Doe picked up the baby and held him.

Someone in another vehicle saw the truck swerving between lanes on the freeway. The witness testified that, though it wasn't raining, the truck's windshield wipers were on. He also said the truck was using its turn signals erratically and the truck would slow to 45 miles per hour and then speed up to 80 miles per hour. He reported the driver to the authorities and began following them.

Eventually, Villa got off the freeway and ran a red light. A California Highway Patrol officer who was responding to the drunk driver report saw the infraction and pulled him over. When the officer approached the vehicle, he smelled alcohol and noticed Doe was holding a baby and saw she had suffered an injury to her face. The officer said Villa's right hand was visibly swollen. Villa gave the officer a Mexican driver's license with a false name.

The officer said it was evident Villa had been drinking. He had red, watery eyes and smelled of alcohol, and his speech was slow and slurred. When he got out of the truck, his gait was unsteady. About 45 minutes after police had detained him, Villa took a breath test that registered a .20 percent blood alcohol level. Villa refused to submit to any

other testing. Officers got a warrant to conduct a blood test. Villa struggled with the officers, but they held him while a phlebotomist drew his blood. That time, his blood registered a .184 percent blood alcohol content, which an expert said meant Villa had a blood alcohol content between .211 percent and .239 percent when he was driving.

Doe had suffered several injuries, including a bloody lip, swollen nose, a lacerated and swollen hand, and a bloody and bruised eye. Some of her hair had been pulled out of her scalp. Three days after she was released from the hospital, she met with a representative from the district attorney's office and they documented her injuries. She later testified that her eye had stayed red for 15 days, and it took months for her hair to grow back.

Doe testified against Villa at a preliminary hearing, where she recounted the abuse in the truck and a second incident of abuse from earlier the same month. She said Villa argued with her, became jealous, and hit her leg with his belt buckle three times. The blows left a scar still visible a month later. She said she didn't report the attack because she was afraid he would hit her again. Doe shut herself in a room with the baby, but was cut off from help because Villa wouldn't allow her to have her own phone. He told her things "could get worse" if she told anyone, warned she could be deported to Mexico, and said he could take the baby away from her.

Villa admitted attending the party and drinking. He said he couldn't remember leaving the party, driving home, being pulled over, identifying himself to the officer, or taking a breath test. He said he did remember that the police later drew his blood. Villa

also said he had no memory of the earlier incident where he hit Doe with his belt and threatened her. He said he didn't know how she got the scar on her leg.

On cross-examination, he denied arguing with Doe at any time during December 2018, denied hitting her with his belt and said he hadn't threatened her. He said they had a good relationship, he trusted and loved her, and there was no turmoil in their relationship. However, he admitted the events Doe had testified about from the night of the party could have happened, though he insisted he had no memory of the events.

B. *Excluding Evidence of Doe's U Visa*

Before trial, defense counsel asked to be allowed to cross-examine Doe about the circumstances behind her request for U visa, which allows an alien who is a victim of certain crimes and who assists law enforcement to remain temporarily in the United States.

The trial judge noted there was little published authority on the issue in California and the few recent unpublished opinions were divided. The prosecutor explained the district attorney's office had received an application regarding Doe's U visa on May 21, 2019. The prosecutor objected to admitting the evidence on the ground it was irrelevant and, if relevant, wasteful, confusing, and unduly prejudicial. Defense counsel argued the evidence should be admitted because it was highly probative of Doe's motivation to lie. She argued the U visa operated as "almost a quid pro quo" because the government was allowing Doe to stay in the country as long as she continued assisting in the prosecution.

6

The trial judge said it seemed likely the evidence could be probative to show Doe's mental state and "whether or not there is bias to fabricate or give more favorable testimony." However, she noted she lacked important information, including whether Doe had provided her preliminary hearing testimony and statements to police before she became aware of the U visa program. The judge indicated the better approach would be to wait until Doe had testified at trial and then consider whether her testimony at trial was materially different from her earlier statements. If not, "then the probative value of that information drops dramatically." However, if her testimony became more favorable to the prosecution after she learned of the U visa program, the evidence would be more probative. The court therefore reserved deciding the issue until Doe testified at trial.

Doe was the first witness. After she testified, the court returned to the issue of admitting evidence about her application for a U visa. The prosecutor described the process in the district attorney's office. When they receive a request, they sign a paper saying the applicant was a victim in a pending criminal proceeding and submit it directly to the federal agency. After that, they wait for the federal agency to notify them if a visa had been approved or denied. In Doe's case, they submitted the application, but hadn't heard anything from the agency, and Doe told them she was unaware of the status of her application.

Defense counsel requested an Evidence Code section 402 hearing so she could ask when Doe found out about the U visa program and what steps she had taken during the application process. The court agreed and held a hearing the next day. Doe said she

7

moved into a shelter on January 25 and stayed there for two months. She said she found out about the U visa program while she was at the shelter, which was after she had testified at the preliminary hearing. She went to the district attorney's office to inquire about the process sometime around May 21. Her cousin helped her fill out the initial application forms. She said she didn't remember everything she was required to do to qualify for the visa, but she understood she would have to cooperate with the prosecution of the case, testify if she was subpoenaed, and testify truthfully. She said she understood she didn't have to testify in any particular manner to be considered "cooperating," but she did understand to qualify for the visa she had to be considered a victim of domestic violence.

Defense counsel argued the evidence Doe had applied for a U visa was relevant and admissible. She argued Doe's trial testimony had been inconsistent with her prior statements and pointed to the fact that Doe hadn't testified at the preliminary hearing that Villa set the baby on the center truck console. The prosecutor argued Doe's testimony established her statements to police and her prior sworn testimony came before she was even aware that a U visa existed and her trial testimony was consistent with those prior statements. The prosecutor argued introducing the U visa issue would waste time and confuse the jury and distract them from the real issues on trial.

The trial judge concluded the evidence was relevant because it suggested a potential motive for Doe to fabricate or exaggerate her abuse. However, the judge found Doe's testimony that Villa placed the baby on the console wasn't exaggerated, only

"slightly different from what was given at the preliminary hearing." She also concluded the potential for prejudice was low because the jury had already learned Doe was an undocumented alien. However, the judge was concerned the evidence would distract the jury and consume undue time and result in testimony by several additional witnesses. The judge excluded the evidence, finding its limited probative value far outweighed by "the tendency of that particular item to open up a massive inquiry requiring an undue consumption of court time and tending to confuse issues and invite jury speculation."

C. *Defense Counsel's Closing Argument*

Defense counsel opened closing argument by acknowledging Villa made some mistakes while drunk but emphasized the People's burden to prove the elements of the charged offenses. "Mr. Villa was drunk and he made mistakes, but that does not mean that he is guilty. [¶] Before we get into the individual facts of this case, I want to talk to you about one of the most important and special things about our justice system. It's the burden of proof that is on the People. The district attorney must prove to you beyond a reasonable doubt each and every element of each and every charge in this case. [¶] By my brief count, there is something like 30-some-odd elements, so you got to make sure they haven't just—you know, proved ten of them. You got to make sure that each and every one has been proved. And they have to prove that to you beyond a reasonable doubt."

Defense counsel then specifically urged the jury to acquit Villa of child endangerment, falsely identifying himself to a peace officer, vandalism, willfully inflicting corporal injury for hitting Doe with a belt, and intimidating Doe. She

9

acknowledged Villa was driving under the influence of alcohol, that he had admitted drinking that night and admitted he didn't remember a large portion of what had happened. However, she argued he didn't endanger the child because it was Doe who removed him from the child safety seat, and he hadn't hit her while she was holding the baby. She attacked the maliciousness element of the vandalism charge, which was based on damage that occurred when officers grabbed Villa while he was standing at a urinal. She argued he couldn't have had the intent necessary for the charge of falsely identifying himself to law enforcement to avoid prosecution because he was so intoxicated he had blacked out. She argued the People hadn't proven the prior act of abuse—hitting Doe with a belt buckle—because Villa denied it and was more believable than Doe. As evidence of his credibility, she argued, "He got on the stand and told you the story from beginning to end. The good parts, the bad parts. He admitted that he had drinks. He admitted that he had that fake ID. He admitted that he resisted the blood draw with the police officers. He told you everything."

Defense counsel concluded, "Ultimately in this case, Mr. Villa made mistakes, but he did not pull the baby out of the car seat. He did not intentionally hit the divider in the bathroom. He did not hand over that ID trying to evade prosecution or other consequences. He didn't hit (Jane Doe M.M.) in the middle of December. And he did not threaten her. [¶] As such, as to the charges of child endangerment, vandalism, providing false identification to an officer, and domestic violence and threatening a witness, you must find Mr. Villa not guilty."

During the prosecutor's closing, she argued the defense "basically . . . conceded the domestic violence in the car." The prosecutor asked the jury to "[n]otice that she didn't say I ask you to find him not guilty on all counts" but rather "specified which counts that she thought she had the argument on."

D. *The Verdict and Sentence*

The jury convicted Villa of willfully inflicting corporal injury (Pen. Code, § 273.5, subd. (a)), child endangerment (Pen Code, § 273a, subd. (a)), driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)), driving with a blood alcohol content of .08 percent or more (Veh. Code, § 23152, subd. (b)), falsely identifying himself to a peace officer (Pen. Code, § 148.9, subd. (a)), giving false information to a peace officer (Veh. Code, § 31), and intimidating a victim (Pen. Code, § 136.1, subd. (b)(1)). The jury also found he had driven with a blood alcohol concentration of .15 or more (Veh. Code, § 23578). The jury acquitted Villa of vandalism. (Pen. Code, § 594, subd. (a).)

The court sentenced Villa to 10 years—six years for child endangerment, consecutive one-year terms for the two counts of inflicting corporal injuries, and a consecutive two-year term for intimidating a victim. The court imposed consecutive sentences or stayed punishment on the other counts.

Villa filed a timely notice of appeal.[1]

---

[1] The court also imposed a criminal protective order and fines and fees not at issue on appeal.

# II

## ANALYSIS

A. *Evidence of Doe's Visa Application*

Villa argues the trial judge should have allowed him to cross-examine Doe about her application for a U visa, which would permit her to remain temporarily in the United States on the basis of her status as the victim of domestic violence who was assisting law enforcement with an investigation or prosecution of the offense. (See Immigration and Nationality Act, as amended by the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101(a)(15)(U); see also 8 C.F.R. § 214.14.)

A party may cross-examine a witness about the witness's motive and bias. (Evid. Code, § 780, subd. (f).) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness," including by "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (*Ibid.*)

However, the right to cross-examine a witness on potential bias, prejudice, or ulterior motive isn't absolute. "A trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 207; see also *People v. Brown* (2003) 31 Cal.4th 518, 545 [a trial court's reliance on Evid. Code, section 352 to exclude evidence of marginal impeachment value does not violate a defendant's right to confront and cross-examine witnesses].) Evidence Code section 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352 (section 352).) Trial courts have broad latitude under section 352 to exclude such impeachment evidence, which helps "'prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.'" (*People v. Ayala* (2000) 23 Cal.4th 225, 301, quoting *People v. Wheeler* (1992) 4 Cal.4th 284, 296.) On appeal, we will uphold a trial judge's exercise of discretion under section 352 unless it was exercised in an arbitrary, capricious, or patently absurd manner. (*People v. Johnson* (2019) 8 Cal.5th 475, 521.)

We begin our analysis with the threshold question of relevance. We agree with the trial judge and Villa that the evidence of Doe's application for a U visa was relevant impeachment evidence. As Villa explained, the evidence was "relevant to show motive and/or bias and was relevant to her credibility." Several out-of-state cases on this issue

have reached the same conclusion. (*State v. Del Real-Galvez* (Or.Ct.App. 2015) 346 P.3d 1289; *State v. Valle* (Or.App. 2013) 298 P.3d 1237; *Romero-Perez v. Commonwealth* (Ky.Ct.App. 2016) 492 S.W.3d 902, 905; *State v. Perez* (S.C. 2018) 816 S.E.2d 550.) We agree with their analysis on this point.

Relevance is a low bar. "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having *any tendency in reason* to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) As the Oregon Court of Appeal explained in *Valle*, "all defendant had to do to lay a sufficient foundation was show that the evidence was relevant, and, to do that, all he had to show was that the evidence had a tendency, however slight, to demonstrate that M had a personal interest in testifying against him." (*Valle*, *supra*, 298 P.3d at p. 1243; cf. Evid. Code, § 210.) In *Valle*, the prosecution showed the victim had applied for a U visa as a victim of abuse in connection with the criminal case against defendant and that the prosecutor's office had signed off on the application. As the court explained, that evidence would allow "a jury [to] infer that M had a personal interest in testifying that she was a victim of sexual abuse . . . [and] that she had an interest in testifying that she was a victim of sexual abuse by *defendant*." (*Valle*, at p. 1243 & fn.2.) To that extent, the facts of this case are identical, and the same logic controls.[2]

---

[2] It's also notable that federal courts have determined prosecutors have a duty to disclose as exculpatory impeachment evidence a cooperating witness's favorable immigration treatment. (*United States v. Blanco* (9th Cir. 2004) 392 F.3d 382, 392 ["Any

*[footnote continued on next page]*

However, relevance only begins the analysis. As we've noted, the trial judge in this case agreed the evidence that Doe had applied for a U visa with the support of the district attorney's office was relevant. However, the court prevented Villa from asking Doe about her U visa application on the ground that the probative value of the evidence was substantially outweighed by the risk of confusing the issues and consuming an undue amount of time. We conclude the trial judge didn't act arbitrarily or irrationally.

First, the evidence of Doe's visa application didn't provide much of a basis to question her testimony. Villa beat Doe in his vehicle on December 30, 2018. On January 16, 2019, Doe provided details about this assault in sworn testimony at a preliminary hearing. During her testimony, she recounted a second incident when Villa hit her with his belt buckle and threatened her with deportation and losing her child if she told anyone about that assault. Doe testified she had no knowledge of the U visa process until sometime after she moved into a shelter on January 25, 2019. If her later testimony at trial simply repeated what she said earlier, there's very little reason to believe discovering she could obtain a U visa motivated her to testify falsely. As it happens, Doe's trial testimony was similar in all material respects. The only difference Villa identifies is that she didn't say he put the infant on the console until after applying for a U visa. But that's just a detail, not a material change to her testimony. Moreover, it's a detail about his treatment of the child, not about his abuse of Doe.

competent lawyer would have known that [a cooperating witness's] special immigration treatment by the INS and the DEA was highly relevant impeachment material].)

In addition, the physical evidence strongly supported the jury's finding that Doe was a victim of domestic abuse. When highway patrol pulled Villa over for running the red light, they found Doe inside the truck, suffering from several serious and obvious injuries. Villa was the only other adult in the truck and therefore very likely the abuser. Doe's scar from the belt buckle provided independent evidence she had suffered the earlier physical abuse. This physical corroboration of her testimony substantially reduced the likelihood that she had made up her story to obtain a visa. We therefore agree with the trial judge's conclusion that the excluded evidence had limited probative value.

On the other hand, the court's concerns about admitting the evidence were well founded. First, the U visa evidence would have been unduly time-consuming to present. Doe would have been called to reiterate her testimony from the Evidence Code section 402 hearing. The attorneys would have had to explore her prior preliminary hearing testimony in detail to determine whether she had changed her story. The parties would reasonably have sought to put on additional witnesses to testify about when Doe had learned about the U visa program, Doe's discussions with the district attorney about the visa program and what was expected of her, and the status of the application. It appeared from Doe's section 402 hearing testimony that her cousin and aunt would have been fact witnesses on the topic of her application and her knowledge of the U visa program. We conclude the trial judge was rightly concerned admitting the U visa issue would "take a huge chunk of time."

Second, the trial judge rightly recognized introducing the topic would have created a substantial risk of distracting and confusing the jury. To properly evaluate whether the visa program gave Doe a strong reason to lie about the abuse, the prosecution and defense attorneys would have had to educate the jurors about the conditions on obtaining a U visa, the process of applying for one, the likelihood the visa would be approved, and the precise effect this would have had on Doe's immigration status. This would have required expert testimony. All these complexities would likely have bogged the jury down in collateral issues and prevented it from focusing on the evidence of Villa's conduct.

Third, the admission of the evidence created at least some potential for prejudicing the jury against Doe. Although the jury knew she was an undocumented alien, there was a danger one or more jurors might be inclined to view her unfavorably if they found out she could use her standing as a victim of abuse to gain a path to legal immigration status. It's possible a juror would not have wanted to convict Villa if they thought doing so would be tantamount to granting Doe permanent status in the United States. This concern is precisely the reason Evidence Code section 351.4 limits evidence of a person's immigration status in criminal trials. (Evid. Code, § 351.4, subd. (a).)

We conclude, where an abuse victim has provided the same basic testimony about suffering abuse before and after learning of the U visa program, the probative force of the evidence she submitted an application for such a visa is significantly outweighed by the risks of prejudice to the victim and of confusing the jury and taking up undue trial time to explain the potential for bias. Certainly, in this case the trial judge did not act arbitrarily

17

or capriciously in deciding to exclude the evidence for those reasons.

Even if the trial judge had erred by excluding the evidence Doe was seeking a U visa, Villa cannot establish prejudice. As explained above, Doe gave sworn testimony about the abuse before she learned of U visas and before she applied for one. Her trial testimony reiterated her prior statements in all important details. Thus, there's little reason to think the jury would have chosen to discredit Doe's testimony had they learned about her attempt to obtain a U visa as an abuse victim cooperating in the prosecution of her attacker. Moreover, there was strong physical evidence supporting each claim of abuse. Doe had a scar on her leg from the time Villa struck her with his belt buckle. Law enforcement found her with a multitude of serious injuries after stopping Villa's truck and found his right hand was very swollen. Villa himself admitted drinking that night to the point of blacking out and claimed only not to remember what had happened. Because physical evidence strongly supported Doe's claims, this was not a case that rested solely on Doe's credibility.

B. *Concessions During Closing Argument*

Villa argues his defense counsel implicitly conceded in closing argument that he committed one count of domestic abuse and two counts of driving under the influence, and by doing so violated his Sixth Amendment right to maintain innocence as the fundamental objective of his defense.

18

Villa bases his argument on the U.S. Supreme Court's recent decision in *McCoy v. Louisiana* (2018) 584 U.S. ___, 138 S.Ct. 1500 (*McCoy*), where the defendant faced three counts of first degree murder, and the prosecutor intended to seek the death penalty. (*Id.* at pp. 1505-1506.) McCoy pled not guilty, and insisted he was out of state at the time of the killings and that police had killed the victims when a drug deal went wrong. (*Ibid.*)

However, before trial, McCoy's attorney informed him he planned to concede guilt because there was overwhelming evidence showing he was in fact the killer. (*McCoy*, *supra*, 138 S.Ct. at p. 1506.) Defense counsel had concluded contesting guilt at trial would make it impossible to avoid a death sentence at the penalty phase. (*Ibid.*) McCoy instructed his attorney not to make the concessions, but defense counsel conceded McCoy had committed the killings anyway, though he argued against first degree murder. (*Id.* at pp. 1506-1507; see also *id.* at p. 1512 [dis. opn. of Alito, J.].) McCoy protested this concession throughout trial, including by testifying he was innocent and presenting an implausible alibi. (*Ibid.*) The jury found McCoy guilty of three counts of first degree murder and sentenced him to death on each count. (*Id.* at p. 1507.)

The United States Supreme Court reversed, holding "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*McCoy*, *supra*, 138 S.Ct. at p. 1505.) "With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the

objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Ibid.*) The *McCoy* court noted when "a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." (*Id.* at p. 1509.) "Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way." (*Ibid.*) The court determined the error was structural and reversed the judgment. (*Id.* at pp. 1511-1512.)

Villa argues these principles apply to his case because his trial counsel effectively—if not explicitly—conceded his guilt on three of the counts he faced. "*McCoy* makes clear, however, that for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear *to his counsel*, and counsel must override that objective by conceding guilt." (*People v. Franks* (2019) 35 Cal.App.5th 883, 891.) Those aren't the circumstances of this case. As our colleagues in the Third District Court of Appeal recently held, to implicate the Sixth Amendment right recognized in *McCoy*, it's not enough to deny guilt during interrogations or express "a general desire to review discovery and help his lawyer 'fight' the prosecution's evidence." (*Ibid.*) A defendant must show they "made it clear to his counsel (or the court) that the objective of his defense was to maintain innocence, or that he voiced 'intransigent objection'—or any opposition—to his lawyer's defense strategy." (*Ibid.*)

20

Villa has not shown his defense counsel violated his right to exclusive control of his defense. Even assuming counsel's remark that Villa had driven while drunk and "made mistakes" and her omission of comments defending him against three of the charges in closing argument constituted concessions of guilt, he hasn't shown he opposed the concessions. California courts following *McCoy* repeatedly have held that case applies only where defendant actively opposes counsel's concession. (*People v. Franks*, *supra*, 35 Cal.App.5th at p. 891 ["for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear *to his counsel*, and counsel must override that objective by conceding guilt"].) In *People v. Lopez*, (2019) 31 Cal.App.5th 55, 66, the court noted "we have found no authority, nor has [the defendant] cited any, allowing extension of *McCoy*'s holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense." Similarly, in *People v. Burns* (2019) 38 Cal.App.5th 776, 784, the court held "*McCoy* is thus predicated on a client's express objection to defense counsel's concession strategy."

Here, as in *Lopez* and *Burns*, there is no evidence Villa opposed his attorney's trial strategy. To the contrary, Villa's own testimony suggests the opposite. He admitted drinking at the party to the extent that he had no memory of leaving the party, driving, punching Doe, pulling over, giving the officer a driver's license, or taking the breath test. He admitted driving after consuming several drinks of tequila was dangerous and that he intentionally gave the officer the wrong identification. By contrast, he expressly denied

21

making the threatening statement or having any arguments with Doe earlier in December 2018, two charges defense counsel did expressly contest in closing argument. If anything, Villa's testimony shows he agreed with defense counsel's strategy, not that he actively resisted it.

Villa argues it's important that he didn't plead guilty and didn't admit guilt. We disagree. The fact that Villa didn't plead guilty before trial doesn't establish that he wanted to assert innocence on all charges once he got to trial. Ultimately, we don't know why Villa chose to go to trial despite the overwhelmingly strong evidence against him, but that choice alone is not sufficient to show he intended to contest guilt on every count at trial. Nor does the fact that Villa testified in his own defense show he wanted to contest guilt on every charge. As explained above, unlike the defendant in *McCoy*, Villa didn't assert he was innocent of all charges, but instead denied guilt as to some charges while claiming to lack any memory related to others. As we noted, his testimony was entirely consistent with counsel's argument that urged the jury to acquit Villa on the counts he explicitly denied.

*People v. Eddy* (2019) 33 Cal.App.5th 472 and *People v. Flores* (2019) 34 Cal.App.5th 270 are not to the contrary. In *Eddy*, the defense attorney conceded the defendant committed voluntary manslaughter and argued the killing wasn't murder, but the jury disagreed. (*Eddy*, at p. 477.) At a posttrial hearing, the defendant told the court, in the presence of his attorney, that counsel "acted contrary to his wishes" by conceding guilt in closing argument. (*Id.* at p. 478.) "Defense counsel did not deny that he conceded

22

guilt in his closing argument notwithstanding defendant's desire to maintain his innocence." (*Id*. at p. 479.) On appeal, the Court of Appeal held, "on this record, that the rule announced in *McCoy* applies here." (*Id*. at p. 481.) There is no such evidence, in this case, of Villa's desire to maintain his innocence on all the counts against him.

In *Flores*, the defendant complained his attorney was "trying to make [him] admit to something that [he didn't] want to admit." (*Flores*, *supra*, 34 Cal.App.5th at p. 275.) At trial on attempted murder charges, counsel argued Flores had been intoxicated and acted without premeditation. (*Ibid.*) At a separate trial on weapon charges, his lawyer conceded possession but argued he had not manufactured the weapon. (*Ibid.*) During the weapon trial, the defendant complained that counsel was incriminating him by saying the gun was his weapon. (*Id*. at p. 276.) Both juries convicted Flores. (*Ibid.*) On appeal, the court concluded that *McCoy* applied because the defendant had "repeatedly objected to counsel's concessions and expressed his desire to maintain his innocence." (*Flores*, at p. 280.) These are cases applying the *McCoy* rule where counsel conceded guilt over a defendant's express opposition. Villa did not expressly oppose defense counsel's tactical concessions, so *McCoy* doesn't apply.

## III

## DISPOSITION

We affirm the judgment.

CERTIFIED FOR PUBLICATION

SLOUGH
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.