Filed 4/12/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D073215 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN371306; SCN374425) |
| ROBERTO IGNACIO FLORES, | |
| Defendant and Appellant. | |

APPEALS from judgments of the Superior Court of San Diego County,

Blaine K. Bowman, Judge.  Reversed.

Kurt David Hermansen, by appointment of the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Robin Urbanski, Kristen Kinnaird

Chenelia and Yvette M. Martinez, Deputy Attorneys General, for Plaintiff and

Respondent.

It is a fact of human nature that people can be their own worst enemies. But in *McCoy v. Louisiana* (2018) ___ U.S. ___, [138 S.Ct. 1500] (*McCoy*), the United States Supreme Court held that fundamental principles of personal autonomy inherent in the Sixth Amendment afford criminal defendants the right to tell their own story and define the fundamental purpose of their defense at trial, even if most other accused persons in similar circumstances would pursue a different objective and accordingly adopt a different approach. In this case, during his trial for the attempted murder of a police officer, defendant Roberto Ignacio Flores repeatedly objected to his counsel's decision to admit Flores was driving the car that seriously injured the officer. In his professional judgment, counsel elected to concede the act of driving and instead assert that Flores never formed the premeditated intent to kill necessary for first degree murder. Similarly at a subsequent trial on weapons possession charges, Flores objected when his counsel decided to concede that Flores possessed certain firearms, instead arguing that the possession was not "knowing" because Flores did not understand the prohibited nature of the weapons.

On appeal, Flores asks that we reverse his two convictions, asserting that under *McCoy* it was structural error for counsel to take a factual position at odds with Flores's insistence that he did not commit the criminal acts alleged by the prosecution. Among other arguments, the People contend that the disagreement between Flores and his lawyer amounted to a strategic dispute about how to best achieve an acquittal—traditionally the province of counsel—rather than an intractable conflict about Flores's goal of

2

maintaining his factual innocence of the charged crimes, purportedly the narrow scope of the *McCoy* holding.

Based on our reading of *McCoy*, however, we are unable to characterize Flores's statements as presenting a mere dispute over trial strategy where counsel's judgment trumps that of the client. In *McCoy*, counsel for the defendant did not admit guilt of the charged first degree murder; he conceded the killing (actus reus) and argued that McCoy was not guilty because he lacked the necessary intent (mens rea) for the offense in light of his serious mental and emotional issues. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1507].) According to the Supreme Court, cases in which a defendant insists on maintaining his innocence of the alleged acts—despite counsel's advice to admit the acts but deny the necessary mental state—amount to intractable disagreements about the fundamental objective of the defendant's representation. (*Id*. at p. 1510.) Under *McCoy*, criminal defense lawyers must allow their clients to dictate the fundamental objective at trial, and thus must not concede the actus reus of a charged crime over their client's objection.

The record before us demonstrates that counsel overrode Flores's stated goal of maintaining his innocence of the alleged acts. Instead, in pursuit of the understandable objective of achieving an acquittal, he conceded the actus reus of the charged crimes at both trials. Although any reasonable lawyer might agree with counsel's judgment, *McCoy* instructs that this is a decision for the client to make. Accordingly, we reverse.

3

FACTUAL AND PROCEDURAL BACKGROUND

A.     *Arrest for Weapons Possession*

In March 2017, Hilary,[1] the sister of Flores's girlfriend Elizabeth, alerted law enforcement to a cache of weapons behind a bookshelf in an old bedroom at her and Elizabeth's family home, where Flores and Elizabeth were living at the time. The collection included guns and gun parts, a hacksaw, toolbox, body armor, Kevlar helmet, and cell phones. One gun was a semiautomatic pistol modified to have many characteristics of an automatic rifle weapons system. It was a 26.5-inch-long center fire weapon, modified to accept a detachable magazine outside of the pistol grip and to release the magazine without a bullet button. Hilary recognized the gun as one Flores had been building in the backyard a few months earlier. Elizabeth's and Hilary's father had also seen the gun and asked Flores to get rid of it.

Shortly thereafter, on the same day his and Elizabeth's newborn son was brought home from the hospital, Flores was arrested on weapons possession charges. He called Elizabeth several times from jail and expressed anger towards the law enforcement officers that arrested him, swearing that when he was released he would go after the people who were responsible. He said the officers harassed and mocked him and discriminated against him. He also asked Elizabeth to claim ownership of the guns and

---

[1]     We use first names for individuals like Hilary and Elizabeth, intending no disrespect.

4

the rest of the property because she did not have a felony conviction and would not be liable. Flores was eventually released on bail.

B.      *Arrest for Attempted Murder*

While out on bail, Flores drove a Dodge Neon automobile into a police officer while the officer was conducting a traffic stop on another vehicle for an expired registration sticker. A few minutes earlier, after initiating the stop, the officer got off his motorcycle and approached the driver's side window of an Acura vehicle in full uniform, including his helmet. According to the driver of the Acura, the Dodge Neon struck the officer, causing him to fly through the air as the Dodge accelerated through the collision and sped away. Other witnesses saw the motorcycle officer slam onto the windshield and tumble up and over the car while, in a single burst of acceleration, the Dodge drove away. The Dodge had plenty of room to drive past without hitting the officer or the Acura, which was scraped in the collision. The officer's injuries were grave and life threatening, but fortunately he survived.

Flores quickly abandoned the car and ran towards a nearby light rail Sprinter Station, discarding a hat and beer can along the way. He was stopped by police officers in the station's parking lot, but he continued to resist. After he was arrested, officers observed Flores's "droopy" appearance with eyes "rolling in the back of his head," as well as glass on his hands and clothing. Analysis of a blood sample taken at 3:00 p.m. showed methamphetamine in his system. The Dodge Neon had a shattered windshield, with the motorcycle officer's radio embedded in it and significant damage to the passenger side and roof. Several empty cans and bottles of beer and propane were found inside the car.

5

The night Flores was arrested, law enforcement placed an undercover Sheriff's detective and a confidential informant in a jail cell. Flores was then placed in the cell with them. For about an hour he talked freely and openly about the events leading to his arrest and his attitude toward law enforcement. For example, while complaining about the police, he offered that "[t]he only thing you can do is rob them . . . [or] kill 'em, one by one, or all by one[.]" The undercover agent responded, "Just like you did today, right? I mean one thing at a time." Flores laughed and responded, "That motherfucker gotta be in a wheelchair." Such comments are typical of the lengthy conversation.

C.      *Trials and Sentencing*

From the outset, Flores expressed considerable discontent with his representation, which was provided by the public defender's office. At the first *Marsden* hearing, Flores said he wanted a new attorney because "they are trying to make me admit to something that I don't want to admit." (See *People v. Marsden* (1970) 2 Cal.3d 118.) He acknowledged counsel told him that the evidence against him included a video of him in the car that hit the motorcycle officer, but Flores still disagreed with their approach: "They are trying to make me admit to guilt." The court denied Flores's request for a new attorney. Flores repeated these claims the following day when he again asked for a *Marsden* hearing and complained about the "kangaroo court."[2]

At the trial on attempted murder charges, Flores's counsel pursued a lack-of-premeditation defense, arguing that while the evidence showed Flores was driving the car

---

[2]      All three of Flores's *Marsden* motions were denied.

that hit the officer, he acted in "the spur of the moment" "especially in light of his intoxicated state." The prosecution, in turn, emphasized that his acceleration through the impact, on a street with considerable room to maneuver, was more than sufficient to demonstrate Flores's premeditation and intent. "When you accelerate your car at another human being, what are you doing? You are intending to kill. That's plain old-fashioned common sense."

At the separate trial on the weapons charges, Flores's lawyer similarly decided to concede possession given the weight of the evidence. But with respect to the charge for manufacturing an assault weapon, counsel contested whether the specific modifications rendered it an assault weapon and argued that Flores did not "reasonably believe[ ] . . . this was [an] illegal weapon as defined as an assault weapon." During this trial, too, Flores expressed his firm disagreement with counsel's decision-making, arguing that counsel was "incriminating me, saying that [the weapon at issue] is mine."

In October 2017, in case No. SCN374425, a jury found Flores guilty of willful, premeditated and deliberate attempted murder of a peace officer (Pen. Code, §§ 187, subd. (a), 664, 189, 664, subds. (e)–(f); count 1), and assault with a deadly weapon upon a peace officer (§ 245, subd. (c); count 2).[3] It also found as to both counts that Flores inflicted great bodily injury (§ 12022.7, subd. (a)) and that he used a vehicle to commit the offenses (Veh. Code, § 13351.5). In a bifurcated proceeding, the jury also found true that Flores had a prison prior (§§ 667.5, sub. (b), 668), and committed the current

---

[3]     Further statutory references are to the Penal Code unless otherwise indicated.

7

offenses while out on bail (§ 12022.1, subd. (b)).  The following day, in case No.

SCN371306 after a separate trial, a jury found Flores guilty of manufacturing an assault

weapon (§ 30600, subd. (a); count 1), and being a felon in possession of a firearm

(§ 29800, subd. (a)(1); count 2;).

The court sentenced Flores to a total term of 29 years to life in prison for the

convictions from both trials.  It imposed a term of eight years for manufacturing an

assault weapon, a stayed two-year term for possession of a firearm by a felon, and stayed

sentence on the prison prior.  It also imposed a consecutive term of 15 years to life for

attempted murder, three years for the great bodily injury enhancement, two years for the

on-bail enhancement, and one year for the prison prior.  The sentence on count 2 (assault

with a deadly weapon) and its enhancements were stayed.

DISCUSSION

The Sixth Amendment guarantees to individuals accused of crimes the right to the

assistance of legal counsel in preparing and presenting their defense.  (See U.S. Const.

Amend. VI; *Gideon v. Wainwright* (1963) 372 U.S. 335.)  In defining the contours of this

right, the United States Supreme Court has noted that the term " '[a]ssistance' of

[c]ounsel" as it appears in the Sixth Amendment "contemplat[es] a norm in which the

accused, and not a lawyer, is master of his own defense." (*Gannett Co. v.

DePasquale* (1979) 443 U.S. 368, 382, fn. 10.)  These decisions trace a line between

decisions the accused controls and the choices counsel may make.  The case law

generally allocates trial management decisions to counsel—such as whether to object to

certain evidence—and reserves weightier, fundamental choices for the accused—

including how to plead and whether to testify, among others. In *McCoy*, the Supreme Court further clarified the basis for this dividing line, explaining that "autonomy to decide that the objective of the defense is to assert innocence" belongs with other fundamental choices in the latter category. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1508]; see *People v. Eddy* (Mar. 26, 2019, C085091) ___ Cal.App.5th ___ [2019 Cal.App. Lexis 257, at p. *4] (*Eddy*) [applying *McCoy* in reversing a conviction for first degree murder in a noncapital case].)

The People suggest that after the pleading stage, the objective of every defense is to seek an acquittal, and that as a result, when counsel reasonably decides that the most effective way to achieve an acquittal is to concede the actus reus, they may properly do so. But counsel's role is to assist, not to control. Under *McCoy*, defense lawyers must allow their clients to dictate the fundamental objective at trial, and must not concede the acts alleged as the actus reus of a charged crime over a client's objection.

A.      *The Supreme Court's* McCoy *Decision*

In 2008, law enforcement officers arrested Robert Leroy McCoy in Idaho, just a few days after three of his estranged wife's family members—her mother, stepfather, and son—were shot and killed in Louisiana. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at pp. 1505–1506].) After he was extradited to Louisiana, McCoy was appointed counsel from the public defender's office. (*Id*. at p. 1506.) A grand jury indicted him on three counts of first degree murder, and the prosecutor sought the death penalty. (*Ibid*.) McCoy pleaded not guilty. He insisted throughout the proceedings that he was not in

9

Louisiana at the time of the killings and that corrupt police murdered the victims after a failed drug deal. (*Ibid*.)

Before trial, McCoy asked the court for leave to represent himself until he could engage new counsel, citing an irreconcilable conflict in the relationship with his assigned attorney. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1506].) The court agreed and granted the motion. Shortly thereafter, McCoy retained Larry English as his new lawyer. (*Ibid*.)

The evidence against McCoy was overwhelming.[4] About two weeks before trial, English decided that given the strength of the evidence, the only way to avoid the death penalty was to concede the killings in the guilt phase of the proceedings. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1506].) English's approach also included arguing that McCoy should be convicted only of second degree murder because of his mental incapacity, although this argument was complicated by Louisiana's prohibition on evidence of diminished capacity absent entry of a plea of not guilty by reason of insanity. (*Id*. at p. 1506 & fn. 1.)

---

[4] First, McCoy's estranged wife was under police protection at the time of the murders because McCoy had threatened to kill her. (*McCoy*, *supra*, ___U.S. at p. ___, [138 S.Ct. at p. 1512].) Second, after calling 911, McCoy's mother in law was heard screaming McCoy's name and saying, " '[s]he ain't here, Robert . . . I don't know where she is. The detectives have her. Talk to the detectives. She ain't in there, Robert.' " (*Id*. at p. 1513.) Moments later, a gunshot was heard, and the call was disconnected. (*Ibid*.) Furthermore, McCoy was arrested with the weapon identified as the one used to shoot the victims, and surveillance footage showed McCoy buying the ammunition on the day of the killings. (*Ibid*.)

10

When English told McCoy about his plans for the defense, McCoy was "furious" and told him " 'not to make that concession.' " (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1506].) English was fully aware of McCoy's " 'complet[e] oppos[ition] to [English] telling the jury that [McCoy] was guilty of killing the three victims.' " [5] (*McCoy*, at p. 1506.) Two days before trial was set to start, McCoy sought to terminate English's representation, and English asked to be relieved if McCoy secured other counsel. (*Ibid.*) English presented this dispute to the court, but the court denied the eleventh-hour request, explaining that counsel must " 'make the trial decision of what [they] are going to proceed with.' " (*Ibid.*)

At the beginning of his opening argument, English told the jurors there was "no way reasonably possible" for them to hear the prosecution's evidence and reach "any other conclusion than Robert McCoy was the cause of these individuals' death." (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1506]; see *id*. at pp. 1512–1513 [dis. opn. of Alito, J.].) McCoy again protested his counsel's concession. Out of earshot of the jury, McCoy told the court that English was " 'selling [him] out' " by conceding that McCoy " 'murdered [his] family.' " (*Id.* at p. 1506.) The court warned him against " 'any other outbursts.' " (*Id.* at p. 1507.) English continued down this same path, asserting multiple times in his opening and closing arguments that McCoy committed the killings. (*Ibid.*)

---

5    A court-appointed sanity commission examined McCoy and found him competent to stand trial. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1506].) English disagreed and asserted several times that McCoy was not competent to stand trial. (*Id*. at p. 1509 & fn. 3.)

English again conceded the killings at the penalty phase and urged mercy in view of McCoy's "serious mental and emotional issues." (*Ibid.*) The jury returned three death verdicts. (*Ibid.*)

The Louisiana Supreme Court affirmed the judgment, concluding that Louisiana Rule of Professional Conduct 1.2(a) (2016) required English to refuse McCoy's request to maintain his innocence of the killings. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at pp. 1509–1510.) According to the court, presenting McCoy's alibi defense would have implicated English in perjury.[6] In light of a split among state courts of last resort as to the constitutionality of allowing defense counsel to concede guilt over the client's objection, the Supreme Court granted certiorari. (*Ibid.*, citing *Cooke v. State* (Del. 2009) 977 A.2d 803, 842–846 (*Cooke*) [counsel's pursuit of a "guilty but mentally ill" verdict over defendant's "vociferous and repeated protestations" of innocence violated defendant's "constitutional right to make the fundamental decisions regarding his case"]; *State v. Carter* (2000) 270 Kan. 426, 440 (*Carter*) [counsel's admission of client's involvement in murder when client adamantly maintained his innocence contravened

---

6    The Supreme Court ultimately rejected this rationale, noting that English "harbored no doubt that McCoy believed what he was saying" and that "English simply disbelieved McCoy's account in view of the prosecution's evidence." (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at pp. 1509–1510].) In such circumstances, the Court identified no authority "requiring English to admit McCoy's guilt over McCoy's objection." (*Ibid.*, citing 3 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 11.6(c), p. 935 (4th ed. 2015) ["A lawyer is not placed in a professionally embarrassing position when he is reluctantly required . . . to go to trial in a weak case, since that decision is clearly attributed to his client."].)

Sixth Amendment right to counsel and due process right to a fair trial]; *Weaver v. Massachusetts* (2017) 582 U.S. ___ [137 S.Ct. 1899] [certiorari].)

In an opinion by Justice Ginsburg, the Supreme Court reversed McCoy's conviction, holding that the Sixth Amendment's guarantee of the right to the *assistance* of counsel precluded his lawyer from admitting McCoy's guilt of the acts alleged as the actus reus of a charged crime over his objection. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at pp. 1505, 1509].) It was for the client—not the lawyer—to determine the objective of the client's defense, and McCoy had a right to insist that he did not kill the victims. He was thus entitled to a lawyer who would represent and attempt to further the object of the defense that McCoy had established. Justice Ginsburg's opinion further explained that defense counsel's actions amounted to structural error requiring a new trial for "at least" two reasons. (*Id*. at p. 1511.) First, the error interfered with McCoy's right to make fundamental choices about his own defense. Second, its effect "would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." (*Ibid*.)

As the Court explained, " [t]he right to defend is personal,' and a defendant's choice in exercising that right 'must be honored out of "that respect for the individual which is the lifeblood of the law.' ' " (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1507].) According to the Court, the same respect for the individual that affords each person the autonomy to decide whether to plead guilty in the face of overwhelming evidence, or even reject the assistance of legal counsel altogether, also allows criminal

13

defendants the right to set the fundamental objective of their own defense. (*Id*. at p. 1508.)

The Court specifically referenced opinions from state courts of last resort discussing circumstances where, as in *McCoy*, "the defendant repeatedly and adamantly insisted on maintaining his factual innocence despite counsel's preferred course: concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses." (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1510], citing *People v. Bergerud* (Colo. 2010) 223 P.3d 686, 691 ["Although defense counsel is free to develop defense theories based on reasonable assessments of the evidence, as guided by her professional judgment, she cannot usurp those fundamental choices given directly to criminal defendants by the United States and the Colorado Constitutions."]; *Cooke*, *supra*, 977 A.2d 803; *Carter*, *supra*, 270 Kan. 426.) According to Justice Ginsburg's opinion, these clashes "were not strategic disputes about whether to concede an element of a charged offense, . . . they were intractable disagreements about the fundamental objective of the defendant's representation." (*McCoy*, at p. 1510.)

B.    *Because Flores Repeatedly Objected to Counsel's Concessions and Expressed His Desire to Maintain His Innocence,* McCoy *Controls and Compels Reversal.*

Flores's objective at both trials was express and unambiguous: to maintain his innocence of the acts alleged as the actus reus of the charged crimes—i.e. driving the car

14

and possessing the weapons—irrespective of the weight of the evidence against him.[7] At his *Marsden* hearing, Flores said his counsel is "trying to make me admit to something that I don't want to admit to." " [Defense counsel] is . . . saying that I'm driving. And I don't want none of that." "[H]e is saying that I should say that I was the one driving" Defense counsel "are trying to make me admit to guilt." Later, Flores again repeated: "He (defense counsel) is not assisting me correctly. He has admitted to some things that I told him not [to]." Rather than follow Flores's direction, counsel's approach was to admit guilt of the alleged acts and argue lack of premeditation: "Was it willful, deliberate, premeditation? Or is it more of just an opportunity that popped up and was taken advantage of?"

Flores also expressed his desire to maintain his innocence at his weapons-charges trial, telling the court, "I told him not to incriminate me." Flores's attorney then interjected that "this might be, again, more of a *Marsden* hearing type issue. Mr. Flores's issue is with [defense counsel's] strategy to say whether or not I'm—" Flores interrupted: "He is incriminating me. I told him I had nothing to do with the property." "He is incriminating me saying that [the weapon] is mine." While Flores did not specifically reference the manufacturing or assembling element of the manufacturing-an-assault-

_____

7    For both attempted murder of a peace officer (count 1) and assault on a peace officer likely to produce great bodily injury (count 2), the prosecution argued that Flores committed the actus reus of the crimes by driving the Dodge Neon into the officer: "He did an act with the intent [to] kill. His act is driving the car." At the second trial, the charges required showing, among other elements, that Flores acted by possessing an assault weapon and assembling it.

weapon charge, we infer from his statement regarding the threshold question of possession that he also wished to maintain that he did not assemble the weapon.

At the trial for weapons possession, Flores's counsel *nearly* followed *McCoy* and maintained Flores's innocence. In closing, the lawyer asserted that the jury would not hear him discuss count 2 (possession of a firearm by a felon; § 29800, subd. (a)(1)). "I'm only going to talk about [c]ount 1. That's what we're here for." With respect to the possession element of count 1 (manufacturing assault weapon; § 30600, subd. (a)), counsel noted, "I'm not going to discuss that," though he then added, "The evidence will lead you to [a] clear answer." Later, counsel briefly raised the possession element again: "And for Mr. Flores to be guilty, he must in addition to actually possessing what is proven to be an assault weapon, . . . [h]e must know or reasonably have known that this was not just a firearm, but knew it was an assault weapon." A few minutes later he continued, "[E]ach of these elements [has to be] proven beyond all reasonable [doubt]. So for instance, if you believe Mr. Flores possessed it beyond all reasonable doubt, okay, you got one of three." But the lawyer also expressly conceded that Flores worked on the gun himself and "would not have treated [the weapon] the way he did around his girlfriend's family" if he thought it were an assault weapon. Counsel stated, "We know Mr. Flores has at least not hidden this gun *because he has worked on the gun at his house*." (Italics added.) Thus, counsel's experience-based approach for achieving an acquittal overrode Flores's objective of maintaining innocence of possessing the weapon altogether.

16

It was not unreasonable for counsel to conclude that conceding the actus reus offered Flores the best chance to achieve an acquittal at either trial. In fact, it might have been the only reasonable course given the considerable evidence against him. On the attempted murder charge, the jury heard multiple eyewitnesses testify that the vehicle accelerated through the impact, and it saw photos and other evidence tracing his movements while fleeing from the vehicle to the Sprinter station, where he was found with glass from the crash on his person. Likewise, the evidence at his trial for weapons possession was overwhelming, including eyewitness testimony by family members that Flores possessed and assembled the weapon. But the required analysis is not affected by the reasonableness of counsel's approach or the competency of their representation. (See *McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at pp. 1510–1511]; see also *Eddy*, *supra*, [2019 Cal.App. Lexis 257, at p. *11] [the choice belongs to the defendant "even in the face of counsel's better judgment and experience"].) Instead, we assess whether the record shows that Flores expressed his objective to maintain innocence of the alleged acts and whether counsel acted in accord with that objective.

The People propose several arguments here for why *McCoy* should not apply. First, they suggest that *McCoy* broke little, if any, new ground and merely confirmed a defendant's right to plead not guilty: "*McCoy confirmed* that 'a defendant has the right to insist that counsel refrain from admitting guilt.' " (Italics added.) Consistent with this reasoning, the People suggest that Flores merely "viewed counsel's suggested strategy to concede that he was driving the vehicle as admitting his guilt." But in making this argument, the People repeat the same error addressed by *McCoy*. They fail to

17

acknowledge that pleading "not guilty" is not the same as maintaining innocence of the alleged acts throughout trial, which as *McCoy* explains a defendant is entitled to do under the Sixth Amendment. (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1510].)

Second, the People "presume[ ]" that Flores's objective was an acquittal, not maintaining innocence of the alleged acts. They argue that Flores "may have disagreed on certain factual concessions his counsel wanted to strategically make, but he never suggested an alternative defense or demonstrated the concessions were in direct conflict with his objective." To make such an argument, however, one must ignore all of Flores's repeated, specific objections. The argument also disregards *McCoy*'s discussion of plausible objectives that a defendant might have at trial, among others the avoidance of the "opprobrium that comes with admitting [one] killed family members." (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at pp. 1508–1509], citing Hashimoto, Resurrecting Autonomy: The Criminal Defendant's Right to Control the Case, 90 B.U. L. Rev. 1147, 1178 (2010) [for some defendants, "the possibility of an acquittal, even if remote, may be more valuable than the difference between a life and a death sentence"]); cf. *Jae Lee v. United States* (2017) 582 U.S. ___, [137 S.Ct. 1958] [recognizing that a defendant might reject a plea and prefer " 'taking a chance at trial' " despite " '[a]lmost certai[n]' " conviction].)

Third, the People suggest that *McCoy* may not apply outside of trials for capital offenses. But while the Supreme Court discussed the capital nature of the case before it, it did not limit its holding to trials for capital offenses, and several aspects of the majority opinion confirm that the same right to dictate one's trial objective applies outside of trials

18

for capital offenses—and perhaps with even greater strength. (See *Thompson v. Cain* (2018) 295 Ore.App. 433 [vacating noncapital defendant's judgment under *McCoy*]; see also *Eddy*, *supra*, ___ Cal.App.5th ___ [2019 Cal.App. Lexis 257] [reversing conviction in noncapital murder case].) The Court singled out capital cases to emphasize that the autonomy of the defendant is of such paramount importance that the Sixth Amendment protects it "even when" the decision sets the stage for a trial that will determine life or death. In the Court's words, "We hold that a defendant has the right to insist that counsel refrain from admitting guilt, *even when* counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." (*McCoy*, *supra*, ___ U.S. at p. ___, [138 S.Ct. at p. 1505], italics added.) From that perspective, the principles guiding the Court in *McCoy* have greater force outside of the capital context, because respect for a seemingly-irrational defendant's desire to maintain innocence would have the same benefit at a lesser cost.[8] Along these same lines, the Court noted, "With individual liberty—*and*, *in capital cases*, *life*—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense . . . ." (*McCoy*, at p. 1505, italics added.)

In light of our conclusion, based on *McCoy*, that the violation of Flores's Sixth Amendment rights constitutes structural error requiring reversal of his convictions, we

---

[8]    This assumes that the costs of the Sixth Amendment's protection of individual autonomy are the outcomes where adherence to the defendant's objective increased their sentence.

need not reach his alternative arguments claiming *Miranda* and due process violations as well as prosecutorial error in closing argument.

## DISPOSITION

The judgments are reversed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

20