Filed 3/10/21  P. v. Sorto CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076931 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN385059) |
| JOSE ANTONIO SORTO, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, William Y. Wood, Judge.  Affirmed as modified.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jose Antonio Sorto, Jr. gave his roommate Freddy G. a difficult choice:  steal an expensive surveillance system or get stabbed.  Sorto and his gang associate Angel Coronado drove Freddy to three different stores, but Freddy was too afraid to follow through on the instructions and finally

managed to flee from the third store.  Sorto later tried to silence Freddy and Coronado through third parties both before and after his arrest.  A jury convicted him of multiple felonies, resulting in a lengthy prison term.

On appeal, Sorto argues he received constitutionally ineffective assistance of counsel under *McCoy v. Louisiana* (2018) 584 U.S. ___ [138 S.Ct. 1500] (*McCoy*) based on comments made by his trial attorney during closing arguments.  We reject this claim, concluding no concession of guilt in fact occurred.  Sorto also challenges his attempted extortion conviction (Pen. Code,[1] § 524), claiming in essence that Freddy could not validly consent to hand over property he had yet to steal.  Although this presents a more challenging issue of statutory interpretation, we ultimately reject this claim as well, finding it sufficient that Sorto *ultimately* sought property from Freddy's coerced theft.  (See *People v. Harper* (2020) 44 Cal.App.5th 172, 191 (*Harper*).)  Modifying the judgment to stay his sentence for attempted extortion pursuant to section 654 and correcting a clerical error found in the judgment minute order, we otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Sorto was a member of the Vista Home Boys gang.  Coronado, a gang associate, sometimes stayed at Sorto's apartment and worked as a drug runner.  Freddy, who was not a gang member, helped Sorto sell methamphetamine in exchange for a place to stay.  The three men were frequent methamphetamine users and would use drugs together.

On March 21, 2018, Sorto accused Freddy of stealing drugs from him and sexually assaulting a woman.  Although Freddy denied those accusations, Sorto forced him into Sorto's car and offered two options:  steal a

---

[1]     Further undesignated statutory references are to the Penal Code.

2

surveillance system or be stabbed with a knife. Sorto and Coronado drove Freddy to two different electronics stores, but Freddy was too afraid to follow through with the proposed theft. Offered one final chance, Sorto drove to Walmart and made Freddy leave his cell phone behind. Inside the store, Freddy explained his predicament to a store manager and asked him to call 911. When Freddy did not exit the store or return to Sorto's apartment, Sorto and Coronado surmised that he was cooperating with law enforcement. Posting messages to Freddy's social media account, Sorto painted him as a traitor who had taken advantage of women and underage girls.

Two days later, Sorto used Freddy's phone to send a message to one of Freddy's friends, Susana C. Acting as if he were Freddy, Sorto suggested a play date with Susana's children outside a fast food restaurant. After Susana arrived and parked in a stall, a vehicle boxed her in from behind. Leaning on Susana's car, Sorto asked her if she had seen Freddy. He eventually left, allowing her to leave.

Deputies searched Sorto's apartment on April 4 and discovered around 18 grams of methamphetamine, a digital scale, and several pipes. Stored on Sorto's cell phone were photos and video suggesting drug transactions.

After his arrest in early May, Sorto tried to pressure Freddy from jail through third parties to drop the charges. In mid-May, he tried multiple times through intermediaries to forcibly pressure Coronado (who had also been arrested) to stop cooperating with law enforcement.

The San Diego County District Attorney charged Sorto by information with a panoply of offenses: kidnapping for extortion of Freddy (§ 209, subd. (a), count 1); simple kidnapping of Freddy (§ 207, subd. (a), count 2); second degree robbery of Freddy's cell phone (§ 211, count 3); making a criminal threat against Freddy (§ 422, count 4); attempted extortion of Freddy (§ 524,

count 5); false imprisonment by menace of Susana (§§ 236, 237, subd. (a), count 6); possessing a controlled substance for sale (Health & Saf. Code, § 11378, count 7); attempting to dissuade a witness (Freddy) (Pen. Code, § 136.1, subd. (a)(2), count 9); and attempting to dissuade a witness (Coronado) by means of force or threat (§ 136.1, subds. (a)(2) & (c)(1), count 10).[2]  A deadly weapon use allegation was added to all counts except 6 and 10.  (§ 12022, subd. (b)(1).)  In addition, as to all counts except count 8, a criminal street gang enhancement was pled.  (§ 186.22, subd. (b)(1).)  Finally, Sorto was alleged to have one prior serious felony conviction constituting a strike (§ 667, subds. (a) & (b)−(i)), and two prior prison terms (§ 667.5, subd. (b)).

In March 2019, the jury acquitted Sorto on count 3 and found the gang allegation accompanying count 6 "not true."  It was unable to reach a verdict on the kidnapping charges (counts 1 & 2) and on the gang allegation accompanying count 9.  But it convicted Sorto as charged on counts 4, 5, 6, 7, 9, and 10 and found the attendant allegations (with the exception of the already referenced gang allegations on counts 6 and 9) true.  In a bifurcated priors trial, the court found the prior strike allegation to be true.  It then granted the prosecution's request to dismiss the two kidnapping counts on which the jury hung.

At sentencing, the court denied Sorto's motion to strike the prior strike conviction (§ 1385, subd. (a); *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497) and imposed a total term of 19 years and 4 months, plus 14 years to life in state prison.

---

[2]    Sorto was not bound over on count 8 of the felony complaint, which alleged simple possession of a controlled substance in violation of Health and Safety Code, section 11377, subdivision (a).

4

DISCUSSION

Sorto attacks his convictions on count 6 (false imprisonment of Susana) and count 10 (forcibly dissuading Coronado from testifying), contending that a Sixth Amendment violation occurred when his counsel conceded guilt during closing arguments. He challenges his conviction on count 5 on a different basis, arguing a surveillance system that Freddy had yet to steal could not be the subject of attempted extortion. We address each of these arguments in turn, rejecting both.

Sorto raises two additional contentions with respect to his sentencing. As to the first, we agree that section 654 precludes separately punishing Sorto for both making a criminal threat (§ 422, count 4) and an attempted extortion based on the same threat (§ 524, count 5). We likewise accept Sorto's request to correct a clerical error in the sentencing minutes.

1.    McCoy *Error (Counts 6 and 10)*

Prior to sentencing Sorto's counsel moved for a new trial. Citing a decision issued by this court after closing argument (*People v. Flores* (2019) 34 Cal.App.5th 270 (*Flores*)), he expressed concern that he had conceded elements of counts 6 and 10 in violation of *McCoy, supra,* 138 S.Ct. 1500 without advising Sorto in advance or obtaining his consent. Finding that a conflict had emerged between defense counsel and his client, the court appointed substitute counsel. Sorto then submitted a declaration denying prior awareness or giving prior consent to a concession strategy. The trial court heard arguments but denied the motion, expressing skepticism as to whether *McCoy* applied where Sorto never objected during trial to his counsel's closing remarks or filed a *Marsden* motion. Even if *McCoy* applied, the court did not believe defense counsel actually conceded guilt on counts 6 or 10 during his closing argument.

Reprising his new trial arguments, Sorto contends his convictions on counts 6 and 10 must be reversed because his counsel impermissibly conceded guilt on those charges during closing remarks.  The People disagree.  Consistent with the trial court's ruling denying Sorto's new trial motion, they suggest Sorto cannot assert this claim when he failed to object until after trial.  Moreover, they argue counsel did not actually concede guilt on those counts.  We accept the latter point, avoiding the need to reach the former.  Reading his entire closing argument in context, defense counsel did not actually concede guilt on either count, meaning that *McCoy* is not implicated.

A criminal defendant has a Sixth Amendment right to the assistance of counsel; the term *assistance* conveys that the accused is the master of his or her defense.  (*Flores, supra,* 34 Cal.App.5th at p. 276; *McCoy, supra,* 138 S.Ct. at p. 1505.)  While trial management decisions (such as whether to object to certain evidence) are left to counsel, "[u]nder *McCoy*, defense lawyers must allow their clients to dictate the fundamental objective at trial, and must not concede the actus reus of a charged crime over a client's objection." (*Flores,* at p. 277, citing *McCoy,* at p. 1508.)  "Presented with express statements of the client's will to maintain innocence, . . . counsel may not steer the ship the other way." (*McCoy,* at p. 1509.)  At the same time, "[i]f a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." (*Ibid.*, citing *Florida v. Nixon* (2004) 543 U.S. 175, 189 (*Nixon*).)  If *McCoy* error is found, it is structural in nature and compels reversal.  (*McCoy,* at p. 1511.)

Since the United States Supreme Court decided *McCoy, supra,* 138 S.Ct. 1500, California courts have grappled with what a criminal defendant must do to preserve his or her constitutional claim.  *McCoy* error has been

6

found where a defendant expressly objected to counsel's concessions and stated his desire to maintain innocence. (*Flores, supra,* 34 Cal.App.5th at pp. 280–283; *People v. Eddy* (2019) 33 Cal.App.5th 472, 482–483.) Conversely, no error has been found where the record does not suggest the defendant ever opposed his counsel's concession strategy or expressed a desire to assert innocence. (*People v. Franks* (2019) 35 Cal.App.5th 883, 891; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1166; *People v. Palmer* (2020) 49 Cal.App.5th 268, 283; *In re Smith* (2020) 49 Cal.App.5th 377, 390.) While it is clear that no constitutional violation occurs if a client is informed of defense counsel's proposed strategy but *declines* to participate in his or her defense (*Nixon, supra,* 543 U.S. at p. 189), it is less clear whether a defendant who is *unaware* of counsel's concession strategy but has expressed a desire to maintain innocence must object in the midst of closing argument to preserve a Sixth Amendment claim.[3] Nevertheless, we need not resolve that question as a closer examination of the record indicates that no concession actually occurred.

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) Where a defendant claims on appeal that a *prosecutor* committed error during closing arguments, "the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there

---

[3]     In moving for a new trial, Sorto's trial counsel submitted a declaration indicating that he had secured his client's express consent to concede guilt on count 7, the drug possession for sale charge. But, as he explained, he did not advise Sorto of his proposed strategy on counts 6 or 10 prior to his closing argument. The court later relieved trial counsel and appointed substitute counsel to argue the new trial motion. In a subsequent declaration, Sorto stated he "was never advised" that trial counsel would be conceding guilt on counts 6 and 10, "adamantly denied" guilt as to both counts, and advised counsel of his position "before and during the jury trial."

was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Id.* at p. 667.) Courts " 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*Ibid.*) Although less commonly argued, the same standard applies in evaluating claims of error by *defense counsel*: we review the entire argument as a whole to evaluate if there is a reasonable likelihood the jury understood them in an improper manner. (See *People v. Gurule* (2002) 28 Cal.4th 557, 627 ["in the context of counsel's entire argument, he did not improperly argue against his client"]; *People v. Samayoa* (1997) 15 Cal.4th 795, 856 [finding "no reasonable likelihood that the jury construed [defense counsel's closing] remarks in a manner prejudicial to defendant"]; see also *People v. Williams* (1997) 16 Cal.4th 153, 265 [although defense counsel's strategy may have been weak or even a bit bizarre, "it certainly falls short of conceding defendant's guilt"].)

Applying that standard to our record, we agree with the trial court that there was no concession of guilt on counts 6 or 10. While counsel's argument was perhaps meandering and disjointed, there is no reasonable likelihood the jury understood it to concede guilt on either count.

Defense counsel began his closing remarks by grouping the charged counts into three categories. First, there were a "bunch of counts" where the prosecution's case rested on the credibility of Freddy and Coronado—the kidnapping, robbery, criminal threat, and extortion counts relating to the attempted electronics heist, as well as the alleged false imprisonment of Susana thereafter (counts 1–6). Second, there was a drug count pertaining to the search of Sorto's apartment (count 7). Third, there were two counts of dissuading a witness based on Sorto's post-arrest jail calls (counts 9–10). As counsel explained, the question on counts 1 through 6 was not whether the

jury liked Sorto's choices regarding drugs and gangs, but rather whether it believed Freddy and Coronado.

With that framework, counsel first explored at length how Freddy was a liar, a thief, and a drug dealer who could not be believed as to the kidnapping, robbery, threat, and extortion counts. Cognizant of these credibility gaps, the prosecution found it "necessary to enlist Angel Coronado" knowing that Freddy would not be believed. But, as defense counsel explained, Coronado could not be trusted either. In his interview with detectives, he seemed to acquiesce rather than volunteer facts, suggesting he was motivated to spin stories from fear of a life sentence. He was also a heavy meth user, meaning "reality might be an issue for him."

Defense counsel next suggested that there were discrepancies in Coronado's testimony itself. Whereas he testified at trial there was not enough room for Susana to back out her vehicle around Sorto's car, at the preliminary hearing he indicated the opposite.[4] He also changed his account as to where the Wal-Mart was located, originally stating it was in Vista but later saying it was in San Marcos when corrected by the prosecutor. These flip flops suggested that Coronado was changing his tune to "get his version in line with the prosecution's" in hopes of a better deal.

Counsel then turned to the charge of false imprisonment (count 6). It is here that Sorto contends an improper concession occurred. The full passage suggests otherwise:

> "I would suggest to you that Ms. C[.] seemed like a decent, honest person and she was telling the truth, as she saw it. [¶] Now, she was very much an emotional thinker, because she said 'I felt' 'I felt' often. And I'm not saying she doesn't

---

[4] Coronado testified at trial that Susana was hemmed in. But he had previously testified at the preliminary hearing that she could have left with some difficulty.

9

have a right to her feelings when a stranger is coming up to her car asking where someone is. [¶] She said that they went inside their pockets -- and even though she didn't see anything -- she interpreted that. Okay.

"Angel Coronado originally said there was enough room for her to back out; she wasn't imprisoned. [¶] Now, this is a problem for both the prosecution and the defense because -- I think we have to be intellectually honest -- in counts 1[] through 5 -- I don't want to you to believe Angel Coronado, I don't find him trustworthy, I don't think he is credible. Well, then, that doesn't help me very much for count 6[.]

"You find Ms. C[.] believable, then I could see how you might consider a guilty verdict on that count. But don't throw out Angel Coronado in that count and accept him in all of the others. [¶] And I want you to keep in mind that she might have been stressed, because her kids were in the car, and so she had a heightened sense of safety when there was some stranger asking questions about Freddy who's out preying on young girls.

"And I also want you to know that Mr. Sorto – according to her -- said nothing to harm her or threaten her or hurt her, which is a hundred percent consistent with who we know him to be."

Contrary to Sorto's claim, defense counsel did not concede guilt on count 6. He simply suggested that while Susana seemed like a decent person who told the truth "as she saw it," she appeared to be an "emotional thinker" who may have perceived things that were not happening. Coronado testified at the preliminary hearing that there was enough room to back out, though counsel did not believe him credible overall. Although counsel could see how the jury might consider guilt on count 6 *if* it believed Susana's testimony, he asked the jury to "keep in mind" her heightened stress levels and admission that Sorto never said anything to harm or threaten her.

10

Although we do not perceive a concession in reviewing this passage alone, any ambiguity in that regard is clarified by what followed. Having advised Sorto in advance of his concession strategy on count 7, defense counsel proceeded to tell the jury that the possession for sale count did not rely solely on the testimony of Freddy or Coronado. "There were drugs there, and there was activity on his phone, I think you have to convict him of that count." As counsel explained, count 7 was "an example of where the government has proven their case, and they haven't needed Freddy G[.] or Angel Coronado to do it." Reading the entire closing argument in context, including the black-and-white nature of the concession on the drug possession count, we conclude no reasonable jury would believe that defense counsel conceded Sorto's guilt on count 6.

We reach the same conclusion as to count 10. Counsel's argument, while something less than surgical, sought acquittal on the basis that "check Angel Coronado" did *not* mean to dissuade him from testifying:

> "Count 10: There's a phone call, you hear Jose Sorto's voice, and he says, 'Check Angel Coronado.' [¶] And so a reasonable inference to that is that he doesn't want him to testify, he wants him to be quiet. [¶] And so even though I don't think that's completely unreasonable, given that someone is lying about him, you don't get to think about that[.] [¶] You try and dissuade[] someone from testifying[.] [I]t's a crime.

> "But there's two allegations attached to it.

> "One says that the defendant knowingly, maliciously accompanied said act by force. An express or implied threat of force or violence upon a victim, witness, or another person. [¶] And you can find that to be true or not true.

> "Now, [the prosecutor] said, oh, 'Check him,' we all know what that means. [¶] The answer is, we don't. [¶] We

11

don't because we know from Detective Hadda[d] that the term 'check' is incredibly broad."

From here, defense counsel took a brief detour into Sorto's recorded conversation with a woman named Gabby. Sorto was "mad as a hornet" but only went so far as to suggest that "one of these days," Gabby would "mess with somebody . . . more connected than I am" who would not just want to talk about her wrongdoing. As the detective had conceded at trial, Sorto's verbal admonishment of Gabby would be a "check." This suggested that the "check" on Coronado was merely a "talking to," or "a verbal admonishment not to engage in behavior that [Sorto] finds unacceptable."

Counsel also explored another aspect of the call with Gabby. By referring to someone "more connected" than he was, Sorto could not have been a shot caller in the gang. In none of the calls did he say, "you have to listen to me" or convey that he was in charge. Moreover, in Coronado and Freddy, he chose two drug addicts to help him. "Can you imagine being a shot caller and asking two drug addicts to do your running," counsel asked. He noted that Sorto worked part time at a Jiffy Lube and had $76 to his name, further casting doubt that he "ran things from the jail."

The clear implication is the *opposite* of what Sorto suggests. Trial counsel did not concede guilt on count 10. He stated it *would be* a crime if "check Angel Coronado" meant stop him from testifying, but that this was *not* the most reasonable inference to draw. Based on Sorto's call with Gabby, it was apparent a "check" was simply a verbal admonishment. This inference was further supported by the lack of evidence suggesting he was a shot caller in the gang who had the power to prevent Coronado from testifying. As the People suggest, "[a]lthough the argument was somewhat disjointed, it is apparent defense counsel was asking for an acquittal." In short, because

12

defense counsel did not concede guilt on counts 6 or 10, Sorto cannot be heard to complain of a Sixth Amendment violation under *McCoy*.

2.      *Sufficiency of the Evidence of Attempted Extortion (count 5)*

The jury convicted Sorto in count 5 of attempted extortion based on the prosecution's theory that he threatened Freddy by demanding that he steal a surveillance system or be stabbed. Sorto argues that conviction cannot stand because Freddy had no possessory interest in a surveillance system he had yet to steal and thus could not validly consent to give it to Sorto. Although framed as a question of sufficiency of the evidence, the issue is really one of statutory interpretation—do the extortion statutes *require* a victim to have a possessory interest in the property being taken by force or fear? As this presents a question of law, we apply de novo review. (See, e.g., *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 7 [examining de novo whether a low-speed motorized device used to move shipping containers qualified as a "vehicle" under Vehicle Code section 10851].)

"Courts may not create a criminal offense by enlarging a statute or giving its terms false or unusual meanings." (*People v. Kozlowski* (2002) 96 Cal.App.4th 853, 865 (*Kozlowski*).) Instead, penal statutes "must be construed according to the fair import of its terms." (*Ibid.*) As we explain, extortion or its attempt do not require a victim to have a possessory interest in the property that a defendant demands. So long as the *ultimate* object of the threat was to obtain property, it is of no moment that the property was not *in* the victim's possession at the time the extortionary threat was made.

We start with the text of the statute. At the time of his offense in March 2018, section 524 proscribed all "attempts, by means of any threat, such as is specified in Section 519 . . . , to extort property or other consideration from another." The completed offense of extortion is defined in

13

relevant part by section 518, subdivision (a) as "the obtaining of property or other consideration from another, with his or her consent."  Subdivision (b) of that statute defines consideration as "anything of value," including sexual conduct.  The People suggest that "anything of value" includes coercing Freddy to steal the surveillance system.

While this argument seems logical, the "other consideration" theory was never presented below.  Rather, the prosecutor continually focused on the surveillance system as the "property" that Sorto sought to obtain.  She began her discussion of the extortion count by explaining to the jury that this was "obviously" *attempted* extortion "because *the property* was never obtained."  She went on to argue that Sorto was trying to "obtain Freddy's consent to get the surveillance system," again indicating the surveillance system was the *property* that Sorto attempted to extort.

More importantly, the jury was instructed with a version of CALCRIM No. 1830 that did not reference "other consideration" and instead asked it to consider whether Sorto intended to use force or fear to make Freddy give him "money or property."[5]  Sorto is "entitled to have the validity of [his] convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." (*Cole v. Arkansas* (1948) 333 U.S. 196, 202; see *People v. Kunkin* (1973) 9 Cal.3d 245, 251 ["We, of course, cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule."].)  Thus, although section 524 now encompasses attempts to obtain "other consideration" by force or fear, the manner in which this jury was instructed means we must focus on whether the defendant attempted to obtain "property."  This in turn requires

---

[5]     The "other consideration" language was added to sections 518 and 524 effective January 1, 2018.  (Stats. 2017, ch. 518 (Sen. Bill No. 500) § 1.)  The amendment likely requires modification of the CALCRIM instruction.

us to assess whether "property" for purposes of extortion includes goods an extortion victim neither owns nor possesses. (See, e.g., § 7, subds. (10) & (12) ["property" includes goods].)

Sorto argues it may not, drawing parallels between extortion and other larcenous crimes. The related crimes of extortion and robbery "have their roots in the common law crime of larceny." (*People v. Torres* (1995) 33 Cal.App.4th 37, 50 (*Torres*).) Both involve acquisition by force or fear, with robbery involving a taking against the victim's will and extortion involving a taking with (coerced) consent. (*Ibid.*) In defining the elements of extortion, several cases articulate that the act proscribed is coerced taking of *the victim's* property. (*Ibid.* [defendant acts with "specific intent of inducing the victim to part with *his or her* property," (italics added)]; *People v. Goodman* (1958) 159 Cal.App.2d 54, 61 [extortion victim gives coerced consent to the "surrender of *his* property" (italics added)].) Relying on these cases, Sorto infers that property subject to extortion *must* either belong to or be possessed by the victim, as only such a person would be is in a position to give coerced consent.[6]

Sorto's argument presents some facial appeal. The completed offense of extortion was previously defined as "the obtaining of property from another, with his consent, . . . induced by a wrongful use of force or fear." (Former § 518, Stats. 1939, ch. 601, § 1.) Attempted extortion covered "attempts, by means of any threat, such as is specified in Section 519 of this code, to extort

---

6    Acknowledging *People v. Beggs* (1918) 178 Cal. 79 (*Beggs*), Sorto admits that a defendant can extort property from a thief who does not *legally* own or possess it. (*Id.* at pp. 85−86.) But even this scenario would envision stolen property or its proceeds already being in the thief's possession. In other words, Sorto suggests that although an extortion conviction could stand if Freddy had *already* stolen the surveillance system, it could not be based on a demand for a system he had yet to steal.

money or other property from another." (Former § 524, Stats. 1983, ch. 1092, § 295.) The structure of former section 518 suggests the same person must relinquish property and give consent induced by force or fear. Here, the prosecution's theory was that Freddy consented under threat to *steal* a surveillance system and *then* deliver it to Sorto. Sorto argues this threat does not suffice for attempted extortion: "the victim must have the ability to exercise control over the disposition of the property — otherwise, the victim has no ability to consent."[7]

Cutting the other way, California cases routinely emphasize that "property" in the extortion statutes must be broadly construed. (See *Kozlowski, supra,* 96 Cal.App.4th at pp. 865–866; *Galeotti v. International Union of Operating Engineers Local No. 3* (2020) 48 Cal.App.5th 850, 861.) While *Kozlowski* and other cases looked to theft and robbery to define property subject to extortion, " '[e]xtortion and theft are not the same offense.' " (*People v. Serrano* (1992) 11 Cal.App.4th 1672, 1677.) For example, claim of right provides an absolute defense to larceny, but not to extortion. (*Ibid.*; see also *People v. Kaufman* (2017) 17 Cal.App.5th 370, 388.) And " '[t]here is not the same need in extortion for a narrow definition of "property" as in robbery, as the acts sought to be punished by the crime of

---

[7] Although not cited by Sorto, we have located one out-of-state case supporting his view. In *State v. Prell* (Ariz.App. 1973) 517 P.2d 1296, defendant was charged with extortion for forcing a woman to deliver her husband's signature on an acknowledgement that a debt owed to the husband was paid. Affirming an order granting a motion to quash the indictment, the court reasoned that the defendant did not obtain property *of the victim.* "There was no transfer of a thing of value from the victim to the defendant. If there could be considered to be a transfer, this was executed by the victim's husband and he is not named in the indictment as being a person who was the subject of the extortion." (*Id.* at p. 1298.) Nowhere in its brief discussion did the *Prell* court explore the concept of consent, but the court nevertheless implied that only the *victim's* property could be extorted.

extortion often result in the obtaining of things of value which would not be subject to robbery from the person.' " (*Kozlowski,* at p. 866.) Robbery requires a felonious taking—i.e., an intent to permanently deprive the victim of the property taken; extortion does not. (*Torres, supra,* 33 Cal.App.4th at p. 50.)

There is a good reason for these differences. When it comes to extortion under California law, "[i]t is the *means* employed which the law denounces." (*Beggs, supra,* 178 Cal. at p. 84, italics added [finding it immaterial that a defendant sought to recover the alleged value of goods stolen from a thief].) "Extortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 326.) *"In substance*, what is proscribed is the successful wrongful use of force or fear to obtain property from another with his or her consent." (*People v. Hesslink* (1985) 167 Cal.App.3d 781, 789.) Extortion occurs where the wrongful use of fear is "the operating cause which produces the consent"—no extortion occurs if the victim consents for some other reason. (*Beggs,* at p. 88; *People v. Bollaert* (2016) 248 Cal.App.4th 699, 725.) From these principles, we deduce that our extortion statutes aim at the effect of a defendant's wrongful use of force or fear to obtain property, and not the *nature* of a victim's property interest or his or her ability to give *valid* consent.

Despite an exhaustive search, we have located just a single California case speaking to whether the victim must own or possess the property being extorted. But that one case gives us reason to reject Sorto's claim. In *Harper, supra,* 44 Cal.App.5th 172, the defendant was convicted of kidnapping for extortion (§ 209, subd. (a)) based on the prosecution's theory that he had twice kidnapped Jane Doe 2 intending to obtain money from her

17

through forced prostitution.  On appeal, he argued his conduct did not qualify as extortion because neither Doe 2's body nor her sexual conduct qualified as *property* subject to an extortionary demand.  (*Harper,* at pp. 190−191.) Rejecting this argument, the court explained that sexual conduct was not the object of Harper's extortion but a mere intermediate step.  Harper intended to hire out Doe 2 as a prostitute to obtain *money*, and using force or fear to obtain money from a victim with her consent amounted to extortion. "Because Harper ultimately wanted money from Doe 2's forced prostitution services, his conduct qualified as extortion prior to the amendment to section 518." (*Harper,* at p. 191.)

We find *Harper* persuasive.  Sorto's object was to obtain an expensive surveillance system, with Freddy's coerced theft being a necessary intermediate step.  Just as it was immaterial that the victim in *Harper* did not yet possess the money ultimately sought by her extortioner, it is immaterial that Freddy did not possess the surveillance system at the time Sorto used fear to demand its theft.  With the focus appropriately placed on Sorto's coercive conduct and its effects, his conviction for attempted extortion was proper even though Freddy lacked a present possessory interest in the property he threateningly demanded.

3.    *Double Punishment*

As previously indicated, the jury convicted Sorto of various offenses, including making a criminal threat (count 4) and attempted extortion (count 5).  At sentencing, the court imposed consecutive terms on counts 4 and 5. Although it stayed the one-year arming enhancement attached to count 5, it did not stay the terms imposed for the main count or attached gang enhancement.

18

Section 654 prohibits double punishment under multiple statutes for the same act or omission. Subdivision (a) provides: " 'An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.' " (See e.g., *People v. Corpening* (2016) 2 Cal.5th 307, 309, 315 [multiple punishment prohibited where "the same action completed the actus reus for each of [the] two crimes"].) Here, the case was presented to the jury on the theory that there was a single threat to Freddy reinforced multiple times as Sorto drove to three different retail establishments. It is also apparent that this single threat—steal a surveillance system or be stabbed—constitutes an essential part of the actus reus for both the criminal threats and extortion convictions. Under well-established principles, Sorto cannot be separately punished for both extortion and making a criminal threat.

Attempting to argue to the contrary, the People point out that Sorto repeated the same threat three different times at three different stores. Characterizing these three instances as multiple threats, they point to the trial court's statement at sentencing, declining to apply section 654 by finding that "the crimes involved separate acts of violence committed at different times and at separate places."[8] They maintain "the trial court could reasonably select one for the criminal threats count and another for the count charging attempted extortion."

---

[8]     The jury convicted and the trial court sentenced on six different "crimes." Beyond this general statement, apparently taken from the probation report, there is no specific discussion of a section 654 issue pertaining to counts 4 and 5.

The People are correct as a matter of theory. If there were at least two separate threats, nothing would preclude separate punishment for both extortion based on one threat, and making a *different* criminal threat. (See, e.g., *People v. Camodeca* (1959) 52 Cal.2d 142, 148–149.) But the fact that the same threat was repeated three times does not mean there were three different threats. Even where it can be said there is more than a single physical act—in this case, more than one verbal statement—whether a single *course of conduct* may be punished more than once depends on the defendant's intent and objective. "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Britt* (2004) 32 Cal.4th 944, 952, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) Here, Sorto manifestly entertained a single objective throughout the excursion—forcing Freddy to steal a surveillance system.

But even if independent objectives for some of the "three threats" could be hypothesized, the People's argument ignores the fact that Sorto was charged with one count of making a criminal threat, not three. And more importantly, the jury was told that both the extortion and criminal threat charges (counts 4 and 5) were based on the same threat. During her closing argument, the prosecutor first explained the criminal threat count as founded on Sorto's directive to Freddy "that was reinforced multiple times throughout the night: either steal or get stabbed." A short time later, referring back to the criminal threat discussion, she indicated that the attempted extortion count was based on the same act—Sorto "intended to use *that* [previously discussed] fear or force to obtain Freddy's consent to get the surveillance system." (Italics added.) The prosecution cannot argue one factual theory to the jury, then adopt a contrary one for purposes of sentencing.

We accordingly conclude the trial court erred by separately sentencing Sorto on both counts 4 and 5. We will modify the judgment to stay the sentence imposed on count 5.

4.      *Clerical Error*

Sorto argues, and the People appropriately concede, that the sentencing minutes must be corrected to delete reference to two prison priors. At the end of trial, the prosecution determined that the prior prison terms alleged in the information were invalid and requested their dismissal. But the trial court made no specific ruling in that regard at the priors trial.[9] In pronouncing the sentence, it did not reference any prison priors. Nevertheless, the minute order from the sentencing hearing erroneously reflects that the prison priors were stricken for purposes of sentencing. The oral pronouncement of judgment controls over the minutes. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Exercising our inherent power to correct clerical errors (*People v. Mitchell* (2001) 26 Cal.4th 181, 185), we will direct the trial court to correct the minutes accordingly.

---

[9]     The minute order is at best confusing. It states: "The Court finds that the allegation in the complaint that the defendant has suffered a serious felony priors [*sic*] and strike priors are true. The People agree to dismiss count 1, count 2, and the allegations to Count 9." The order goes on to list four items without any elaboration:
> **First Strike pursuant to PC667(b)-(i)/1170.12**
> **First Serious Felony Prior pursuant to PC667(a)(l), 668, and 1192.7(c)**
> **First Prison Prior pursuant to PC667.5(b)**
> **Second Prison Prior pursuant to PC667.5(b)**

What is happening with respect to the prison priors is never specified.

DISPOSITION

The judgment is modified to stay the term imposed in count 5 for attempted extortion (§ 524) and the associated enhancements pursuant to section 654. The November 20, 2019 minute order of the sentencing hearing is amended to omit reference to Sorto's alleged prison priors. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

DATO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

22